**In re Petition for DISCIPLINARY ACTION AGAINST John Remington GRAHAM, an Attorney at Law of the State of Minnesota.**

**No. C3–88–1760.**

Supreme Court of Minnesota.

March 23, 1990.

William J. Wernz, Director of Office of Lawyers' Professional Responsibility Bd., St. Paul, for appellant.

John Remington Graham, Quebec, Canada, pro se.

PER CURIAM.

This matter comes before us on petition from the Director of the Lawyers Professional Responsibility Board for disciplinary action against John Remington Graham, respondent. The Director charged Graham

with violating Rules 3.1, 8.2(a), and 8.4(d), Minnesota Rules of Professional Conduct, by making false statements regarding the integrity of a judge, a magistrate, a legal officer and a lawyer without basis in fact and with reckless disregard for the truth or falsity of the statements.

The statements accused Minnesota District Court Judge John Spellacy, United States Magistrate Patrick J. McNulty, Crow Wing County Attorney Stephen Rathke and Rathke's attorney, Michael Milligan, and others of a conspiracy fixing the outcome in the federal case of *Shockman v. Rathke*, No. CV-5-87-260 (D.Minn. Dec. 21, 1988). The statements appeared in an unsworn letter to United States Attorney Jerome Arnold, in a sworn complaint to Chief Judge Lay of the Eighth Circuit Court of Appeals alleging judicial misconduct against Judge McNulty, and in an affidavit in support of a motion to recuse Judge McNulty from considering whether attorney fees should be awarded against Graham in the *Shockman v. Rathke* case.

A hearing on the Director's petition was held in Little Falls, Minnesota on December 13–15, 1988, before the Honorable Paul Hoffman acting as referee. He made his findings of fact and conclusions of law on February 21, 1989. Graham's counsel received the referee's report on February 24, 1989 and immediately contacted Graham in Quebec, Canada to discuss it. Based on discussion of the referee's report with his counsel, Graham decided to settle. Settlement negotiations broke down, however. Graham now disputes the referee's factual findings and conclusions and has moved for permission to order a transcript.

## I. MOTIONS

A. Motion for permission to order a transcript

■ Review of this disciplinary action is limited by Rule 14(e), Rules on Lawyers Professional Responsibility ("RLPR") (1989 Supp.), which provides in part:

The referee shall make findings of fact, conclusions, and recommendations, file them with this Court, and notify the respondent and Director of them. Unless the respondent or Director, within ten days, orders a transcript and so notifies this Court, the findings of fact and conclusions shall be conclusive.

Graham argues that Rule 14(e) requires service of the findings and conclusions directly on him as respondent even though he was represented by counsel. Rule 14(e) does state that the respondent is to be notified. Rule 1, RLPR, defines "notify" as meaning "to give personal notice or to mail to the person at his last known address or the address maintained on this Court's attorney registration records." No express provision of the RLPR states that the respondent must be *personally* served with notice, however. RLPR 14(b) does state that the referee hearing "shall be conducted in accordance with the rules of civil procedure applicable to district courts." Minnesota civil procedure rules require service of represented parties to be on the attorney. Minn.R.Civ.Proc. 5.02 and Minn.R.Civ.App.Proc. 125.03. Because notification of the findings and conclusions of the referee flow from the hearing proceeding itself, we hold that the civil procedure rules also apply to Rule 14(e). Thus, notification to Graham's attorney constituted notification to respondent Graham under Rule 14(e) and definitional Rule 1.

■ Graham's attorney did receive notice of the findings and conclusions on February 24, 1988 and immediately contacted Graham by telephone to discuss them. Graham thereby also had actual notice. He decided to settle based on that information. In fact, he was willing to rely on that information to such an extent that he returned a signed version of the stipulation without ever having received a copy of the referee's report and even though he thought the report was "far from the truth." Director's Response to Motion at 2. In short, from both a technical and equitable point of view, Graham received notice as required by Rule 14(e). As he did not order a transcript within the requisite period, the findings of fact and conclusions

made by the referee are conclusive.[1] *See Application of Hetland*, 275 N.W.2d 582, 583, 583 n. 5 (Minn.1978).

### B. Motions for removal of Director Wernz and his assistant from this case

In addition to his motion for permission to order a transcript, Graham moved for the removal of Director Wernz and his assistant from this matter and for the removal of Director Wernz from office.

The issue of whether Wernz should be removed from Graham's disciplinary hearing was considered at the disciplinary hearing itself. Finding 50 found no grounds for removal. We have reviewed the record and concur. Moreover, under the review standard of Rule 14(e), that finding is conclusive. Consequently, we deny his motion.

The motion to remove Wernz's senior assistant is summarily denied. Graham himself states in his motion: "I do not believe [Wernz's] assistant has done anything questionable * * *." That being the case, no reason appears to remove her.

### C. Motion to remove Director Wernz from office

Graham also filed a petition with this court for removal of Wernz from office. We find no merit to his motion and therefore deny it.

## II. REFEREE'S FACTUAL FINDINGS

Having disposed of Graham's motions, we turn to the substance of this disciplinary hearing. The referee's factual findings were comprehensive and may be summarized as follows:

Graham has been a licensed Minnesota attorney since 1967. He practiced in Brainerd, Minnesota from 1981 until August 1988, when he moved to Quebec, Canada.

While practicing in Brainerd, substantial personal and political ill-will arose between Stephen Rathke, Crow Wing County Attorney, and him. The animosity continued throughout the period covered by this matter.

Graham's statements against Rathke, Spellacy, McNulty and Milligan, which led to this suit for disciplinary action, followed the *Shockman v. Rathke* decision that denied issuance of an injunction against prosecution of Michael Shockman. The background of that case forms the basis for Graham's accusations and this disciplinary matter.

On September 21, 1987, Michael Shockman struck his seven-year-old son on the face causing facial bruises. The son's school reported the bruises. Brainerd city police removed the boy from school and placed him in protective custody on September 25, 1987. The Shockmans retained Graham on September 26, 1987 to help them regain their son. The son was returned to the family on September 28, 1987.

On October 1, 1987, subsequent to the child's return, Graham wrote to a member of the Crow Wing County Board complaining about the handling of several custody and child protection cases, including that of the Shockmans. He did not refer to the Shockmans by name. He criticized Rathke in particular, but not in connection with handling the Shockman case. The letter caused heated debate at the county board meeting held on October 6, 1987.

On October 9, 1987, an assistant Crow Wing County attorney, with the agreement of Rathke, signed a fifth degree assault charge against Shockman for striking his son. Graham, as the Shockmans' attorney, filed a federal court complaint on October 21, 1987 seeking to enjoin the assault prosecution on the grounds that Rathke had

---

1. Finding 49 is an exception. Finding 49 found statements Graham made in letters to the Director regarding Judge Spellacy false. Those allegations were not the subject of formal charges against Graham. As a matter of due process, Graham cannot be found to have violated disciplinary rules by certain actions which were not the subject of formal charges. *See In re Ruffalo*, 390 U.S. 544, 88 S.Ct. 1222, 20 L.Ed.2d 117, *reh'g denied*, 391 U.S. 961, 88 S.Ct. 1833, 20 L.Ed.2d 874 (1968), as applied in *Disciplinary Proceedings of Phelps*, 637 F.2d 171, 174 (10th Cir.1981). As a result, finding 49 cannot be part of the conclusion of law finding a violation on that ground.

commenced it *in retaliation for Graham's letter to the county board.*

In response, Rathke requested district court judge John Spellacy to convene a grand jury to consider whether to indict Michael Shockman for assault and to inquire into the process which gave rise to the criminal complaint against Shockman. A grand jury was convened in the Shockman matter, and a special prosecutor unconnected with Rathke was appointed. The grand jury returned an indictment against Michael Shockman. During this period, Judge Spellacy had remarked to Graham that Graham's comments in his October 1, 1987 letter might constitute criminal defamation. No charge or indictment was made as to possible defamation by Graham, but Graham took Spellacy's comment to mean the grand jury had really been convened to indict him for criminal defamation.

On December 9, 1987, Rathke, Rathke's attorney Michael Milligan, and Graham met with Magistrate Patrick J. McNulty in Duluth on Graham's motion for a temporary injunction in the *Shockman* case. They decided to hold an expedited trial in January on the suit for permanent injunction. The referee found that the proceedings and results of this December 9 hearing did not support Graham's later assertion that at that hearing

> [t]he judge had indicated preliminary approval of the suit. The evidence seemed reasonable. The law ... seemed reasonable.... [McNulty] suggested clearly enough that the matter might have real merit.... [and] clearly enough hinted he was going to give my clients ... relief pendente lite.

*In re Graham,* No. C3–88–1760, Finding of Fact 20 (Feb. 21, 1989) (hereinafter "Order"). Graham filed an amended complaint following the December 9 hearing. Milligan answered on Rathke's behalf alleging violation of Rule 11 of Minnesota Rules of Civil Procedure and Minn.Stat. § 549.21 (1988) and asserting rights to attorney fees, costs and disbursements.

The expedited trial seeking an injunction was held January 4–6, 1988. McNulty found for defendant Rathke. Milligan moved for award of attorney fees. His argument in support of the motion described Graham as the real party in interest who brought the suit only in order to harass and embarrass Rathke. The referee found Milligan's written argument reasonably made and not a "bizarre procedural irregularity" as Graham claimed it to be.

In late January, Graham heard via a third party about a conversation that occurred during a local bar association Christmas party held on December 11, 1987. According to what Graham heard, Bruce Alderman, who attended the party, understood someone to say that Milligan had telephoned someone else who in turn contacted the judge in Duluth about the upcoming *Shockman* case and that "everything had been taken care of" or the result "was in the bag." Graham suspected a conspiracy and contacted Alderman to discuss the conversation. During the meeting, Graham tried to get him to say that Spellacy was the middleman in the "conspiracy," but to the contrary, he never indicated that Spellacy was or could have been the middleman, nor did he say that Rathke's name had been mentioned in connection with the "conspiracy."

Based on (1) his interview with Alderman, (2) his belief that Milligan engaged in bizarre procedural irregularities, and (3) that McNulty showed an abrupt change in attitude from the December 9 hearing and the trial, Graham made the accusations that are the basis of this disciplinary action. Sworn accusations were made on the basis of Graham's "certain knowledge" that the case was fixed at some time during December 9–11, 1987, at least three weeks before trial, by means of improper influence consisting of "political connections and illicit persuasion."

In a letter to Jerome Arnold, United States Attorney, Graham alleged that at the request of Rathke, Milligan had contacted Judge Spellacy who contacted Magistrate McNulty and obtained McNulty's commitment to decide the upcoming case of *Shockman v. Rathke* without regard to the

law and facts.[2]  Noting that Graham later acknowledged that Rathke may not have requested the case be fixed, but only acquiesced in a fix arranged by others, the referee found that "[t]here was no reasonable basis for these allegations in respondent's log [EVIDENCE] or elsewhere." Order, finding 38.

In a complaint of judicial misconduct,[3] Graham alleged "of his certain knowledge" that Judge Spellacy "using his long established political connections and friendship as the *modus operandi* " obtained Magistrate McNulty's commitment to decide against the Shockmans. [Graham] further alleged * * * [that] "it was in fact known to Mr. Rathke, Mr. Milligan, Judge McNulty and others how the case would be decided some three weeks before the opening of trial on January 4, 1988, all as a consequence of corrupt influence ..."

Order, finding 44.  The referee found these accusations to be false, both as statements and in the sense that they were made as absolutes when in fact Graham admitted at the disciplinary hearing that:

> by "political" he meant "old boy influence peddling" not just organized political party connections * * * [and] that by "certain knowledge," he meant several things, including "belief" and "great probability."

Order, finding 45.  The referee noted that Graham

2.  The FBI investigated the conspiracy charges in response to Graham's complaint to U.S. Attorney Arnold.  The investigation included interviews of the alleged parties involved.  Alderman verified the essence of the conversation, namely that the Shockman case was "in the bag," but stated that he did not remember any specific names mentioned, though names had been mentioned.  Steinbauer admitted discussing the upcoming *Shockman v. Rathke* case with Alderman, but stated that he had said the Shockman case would be decided in favor of the County and Rathke based on his understanding of the law and what had happened.

3.  Because Graham had "made public the charges and they have appeared in newspaper stories in the State of Minnesota," Order in JCP No. 88–001, at 1 n. 1, Magistrate McNulty waived confidentiality as to the record and filings.  The record shows that Chief Judge Lay considered the complaint against McNulty to be broader than mere dissatisfaction with the result of the *Shockman v. Rathke* case, although it emanated from it.  Therefore he had to determine whether the complaint was frivolous in its content.  Judge Lay noted that Graham stated in his affidavit as his mainstays of proof:

> (1) the abrupt change of attitude by Judge McNulty [that is, Graham charges that Magistrate McNulty was very cordial during a pretrial conference, but became hostile during the trial], (2) the bizarre procedural irregularities indulged in by Mr. Milligan and allowed by Judge McNulty, and (3) the confession of a co-conspirator, viz., Mr. Steinbauer, all corroborated [sic] by circumstantial evidence of the corpus delicti.  This evidence is enough, in my opinion, to secure indictments under 18 United States Code, Section 241 and/or 242, or 371 and/or 1503.  See, e.g., *Pettibone v. United States,* 148 U.S. 197 at 202–03 [13 S.Ct. 542 at 545, 37 L.Ed. 419] (1893).

Order, May 20, 1988, re JCP No. 88–001 at 8–9, 9 n. 4.

The Chief Judge stated that "[t]he alleged irregularities of Milligan relate to arguments he made before Magistrate McNulty which, in effect stated that the real party in interest in the federal proceeding was actually Graham, based upon his personal dislike for Rathke, the Crow Wing County Attorney."  Id. at 9.

After examining the evidence presented by Graham and the FBI interviews, Chief Judge Lay concluded:

> I find there is no evidence whatsoever that even suggests Magistrate McNulty engaged in judicial misconduct.
>
> Magistrate McNulty's ruling in favor of the defendant and against Graham's client does not in any way imply misconduct.  Not only is a prayer for federal injunctive relief against a state criminal proceeding rarely granted, but Magistrate McNulty's thorough and objective opinion and legal analysis belie Graham's conclusory statement that the case was predetermined.
>
> * * * Graham even concedes that he is engaging in speculation based both upon Judge Spellacy's supposed "friendship" with Magistrate McNulty and the speculation that Judge Spellacy owed Attorney Milligan (Rathke's counsel) a favor.  No rational fact finder could draw such a conclusion.  The major and minor premises to Graham's supposed syllogistic reasoning are: (1) Spellacy is a judge, and (2) he has a friendship with McNulty.  However, to therefore conclude they entered into a criminal conspiracy is absurd.  * * * Graham alone * * * supplied the names of all of the participants based upon his own speculation.

Order, May 20, 1988, re JCP No. 88–001 at 11–12.

is a learned and intelligent attorney, capable of using words according to their normal meanings. In these and other instances he either chose not to do so or, when confronted by evidence, to try to explain away his specific claims.

*Id.*

Graham also made similar accusations in his sworn affidavit in support of the motion to recuse Magistrate McNulty from considering the award of attorney fees in the *Shockman* case. The referee also found these statements to be false.

The referee in this disciplinary matter found that nothing in the *Shockman v. Rathke* trial transcript supported Graham's allegations that Milligan knew what was going to happen at trial before it happened; nor did it support Graham's allegations that Judge McNulty was exceedingly biased, displayed an abrupt change of attitude from the December 9 meeting, and had his mind made up before he walked into the courtroom. Moreover, the referee found that Milligan's post-trial written argument in support of awarding attorney's fees was reasonable and not a "bizarre procedural irregularity."

Additionally, Graham stated under oath in both the complaint to the eighth circuit and in his affidavit that "of his certain knowledge" the acts of fixing the *Shockman* case were done "with the knowledge and consent" of "others," yet at the hearing before the referee, Graham testified that *he had no knowledge of any "others" involved.* Again, the referee found his allegations against "others" false.[4]

Voluminous telephone records and testimony as to the whereabouts of the various people accused of the conspiracy during the relevant period belied Graham's conclusions. Thus, the referee also found that the accused parties could not have conspired as alleged because evidence showed no contact between the parties occurred

during the relevant period: December 9–11, 1988.

In sum, the referee found that Graham had no reasonable basis for his assertions of a conspiracy in the *Shockman v. Rathke* case and that his allegations were false, frivolous, and made in reckless disregard of their truth or falsity.

## III. REFEREE'S CONCLUSIONS OF LAW

Based on his findings, the referee concluded that Graham's statements regarding the integrity of Judge Spellacy and Crow Wing County Attorney Rathke were made without basis and fact and with reckless disregard for the statements' truth or falsity, in violation of Rules 3.1, 8.2(a) and 8.4(d), Minnesota Rules of Professional Conduct; those regarding Magistrate McNulty were false and made without basis other than the report of Alderman and in reckless disregard of their truth or falsity, in violation of Rules 3.1, 8.2(a) and 8.4(d); and those made against Milligan were false, without basis other than Alderman's report and in reckless disregard as to their truth or falsity, in violation of Rules 3.1 and 8.4(d). Pursuant to Rule 14(e), those findings and conclusions are conclusive upon review of the disciplinary action.

## IV. ABSOLUTE IMMUNITY

Graham argues that regardless of the findings, he cannot be disciplined because the statements were petitions for redress of grievances, and what he said in them is absolutely privileged under the first amendment. Thus he enjoys absolute immunity from any and all forms of criminal or civil prosecution.

■ Graham misconceives the privilege. The petition clause does not provide an absolute privilege against all forms of pros-

---

**4.** Graham also lodged a complaint with the Lawyers Professional Responsibility Board against the same parties he accused of conspiring to fix the Shockman case. On the basis of testimonial evidence taken from all the parties involved, the Office of Professional Responsibility concluded with respect to Graham's com-

plaint against the other parties of violation of the rules of professional responsibility that "[t]hese events might easily have led to inquiry; they should not have led to accusation or allegation that in fact a conspiracy took place." Memorandum to Determination that Discipline is not Warranted, July 5, 1988, at 7.

ecution. *See, e.g., McDonald v. Smith*, 472 U.S. 479, 484, 105 S.Ct. 2787, 2790–91, 86 L.Ed.2d 384 (1985) (holding petition clause does not provide absolute privilege against defamation; petitions to the President containing intentional and reckless falsehoods do not receive constitutional protection and may be reached by libel law); *Bill Johnson's Restaurants, Inc. v. N.L.R.B.*, 461 U.S. 731, 743, 103 S.Ct. 2161, 2170, 76 L.Ed.2d 277 (1983) (First Amendment right to petition does not immunize against baseless litigation).

The question of absolute privilege comes before this court, not within the context of a criminal or civil prosecution, but rather within the context of an attorney disciplinary action. As this court stated in *In re Daly*, 291 Minn. 488, 490, 189 N.W.2d 176, 178 (1971):

> Although disciplinary proceedings have been described in the context of the requirement of procedural due process as "adversary proceedings of a quasi-criminal nature" (*In re Ruffalo*, 390 U.S. 544, 551 [88 S.Ct. 1222, 1226,] * * *), * * * they are not considered in the same light as an ordinary adversary action but are proceedings sui generis:
>
> "A disciplinary proceeding is not the trial of an action or suit between adverse parties, but an investigation or inquiry by the court into the conduct of one of its officers in order to determine his fitness to continue as a member of his profession." *In re Application for Discipline of Peterson*, 260 Minn. 339, 344, 110 N.W.(2d) [sic] 9, 13 [ (1961) ].

*Id.* Disciplinary proceedings are designed to

> discharge this court's responsibility to protect the public, the administration of justice, and the profession by imposing disciplinary sanctions, including removal from practice, upon those attorneys who, after careful investigation, proper notice, and hearing, are found to have demonstrated that they do not possess the "qualities of character and the professional competence requisite to the practice of law."

*Id.* at 489, 189 N.W.2d at 178 (quoting *Baird v. State Bar of Arizona*, 401 U.S. 1, 7, 91 S.Ct. 702, 706–07, 27 L.Ed.2d 639 (1971); other citations omitted). They are not designed "to prevent [an attorney] from, in good faith, espousing a legal cause, however unpopular or seemingly untenable." *Id.* In short, disciplinary actions require a different legal approach.

Thus, the issue becomes to what extent constitutional first amendment rights have application in disciplinary proceedings when an attorney brings serious charges against judges and legal officials impugning their integrity.

In the interest of free speech, a limited immunity protects from civil or criminal defamation those who would criticize public officials for their official conduct. *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80, 84 S.Ct. 710, 725–26, 11 L.Ed.2d 686 (1964); *Garrison v. Louisiana*, 379 U.S. 64, 74, 85 S.Ct. 209, 215–16, 13 L.Ed.2d 125 (1964). Even though critical statements of fact regarding the official are false, the public official cannot recover unless the statements were made with "actual malice," which is defined as knowledge that the statements were false or made with reckless disregard of their truth or falsity. *New York Times*, 376 U.S. at 279–80, 84 S.Ct. at 725–26.

Neither Minnesota courts nor the United States Supreme Court have expressly extended the constitutional qualifed immunity beyond the area of civil and criminal proceedings to attorney disciplinary ones. Various commentators have advocated such an extension, however. *See* Comment, *The First Amendment and Attorney Discipline for Criticism of the Judiciary: Let the Lawyer Beware*, 15 N.Ky.L. Rev. 129 (1988); *see also* Note, *Restrictions on Attorney Criticism of the Judiciary: A Denial of First Amendment Rights*, 56 Notre Dame L.Rev. 489, 504–05 (1981); *Cf.* Rieger, *Lawyers' Criticism of Judges: Is Freedom of Speech a Figure of Speech?*, 2 *Const. Commentary* 69 (1985); G. Hazard & W. Hodes, *The Law of Lawyering* 552–54 (1985). A few jurisdictions in dicta have indicated that the constitu-

tional actual malice standard applies to attorney disciplinary proceedings. *See, e.g., Eisenberg v. Boardman,* 302 F.Supp. 1360, 1362 (W.D.Wis.1969) (noting that whether derogatory statements made by attorneys about judges are protected by *New York Times* actual malice standard from imposition of attorney discipline "has not been made clear," but assuming some speech considered disrespectful to judiciary would be so protected); *State Bar v. Semaan,* 508 S.W.2d 429, 432–33 (Tex.Civ.App.1974) (noting that whether derogatory statements about public officials, including judges, are constitutionally protected from imposition of attorney disciplinary sanctions "has not been authoritatively determined").

Constitutional first amendment rights have long protected Minnesota attorneys from disciplinary action when those rights were exercised either to criticize rulings of the court once litigation was complete or to criticize judicial conduct or even integrity. *See State Board of Law Examiners v. Hart,* 104 Minn. 88, 114–20, 116 N.W. 212, 214–17 (1908). Yet, the protection granted has not been absolute. When an attorney abuses that right, he/she is subject to discipline. *See, e.g., In re Williams,* 414 N.W.2d 394, 396 (Minn.1987) (rejecting argument that attorney's actions were merely exercise of free speech, court distinguished between conduct of ordinary citizen and that of attorney in court and disciplined attorney for falsely attacking moral character of witness).[5]

This court, however, has not previously determined whether the constitutional qualified immunity standard of *New York Times* applies when determining whether Rule 8.2(a) has been violated. The language of Rule 8.2(a), MRPC, impliedly incorporates the standard. It provides:

8.2 Judicial and Legal Officials

(a) A lawyer shall not make a statement that the lawyer knows to be false or with reckless disregard as to its truth or falsity concerning the qualifications or integrity of a judge, adjudicatory officer or public legal officer * * *.

On its face, Rule 8.2(a) rejects an absolute privilege for false statements made by attorneys with reckless disregard for their falsity. It is identical to Rule 8.2, American Bar Association Model Rules of Professional Conduct ("ABA MRPC"). Commentators have noted that Rule 8.2, ABA MRPC, is consistent with the constitutional limits placed on defamation actions by the United States Supreme Court cases of *New York Times* and *Garrison. See, e.g.,* Hazard & Hodes, *supra,* at 552–54.

■ Nevertheless, the standard cannot be equivalent to that of *New York Times* and its progeny, because the standard for determining actual malice must be objective when dealing with attorney discipline.[6]

---

**5.** In *In re Williams,* this court found that when an attorney is in the courtroom, as an officer of the court engaged in court business, "appropriate rules of evidence, decorum, and professional conduct [governing his/her speech] do not offend the first amendment." *Id.* at 397 (citing *In re Getty,* 401 N.W.2d 668 (Minn.1987)). Trial tactics calculated to demean the witness and to convert relevant questions into a false personal attack on the witness violated Rule 8.4(d) (conduct prejudicial to the administration of justice). *Id.* at 395–97. Additionally, this court noted that the Supreme Court, in *In re Snyder,* 472 U.S. 634, 644–45, 105 S.Ct. 2874, 2880–81, 86 L.Ed.2d 504 (1985), stated that, " 'The license granted by the court requires members of the bar to conduct themselves in a manner compatible with the role of courts in the administration of justice.' " *Williams,* 414 N.W.2d at 397. The Supreme Court in *In re Snyder,* however, did not reach the constitutional first amendment issue, but rather decided the case on the basis of possible violation of the professional rules.

**6.** That is in contrast to the subjective standard applied to determine actual malice. *See Harte–Hanks Communications, Inc. v. Connaughton,* —— U.S. ——, 109 S.Ct. 2678, 2696, 105 L.Ed.2d 562 (1989). In *Harte–Hanks,* the Court explained the constitutional standard for determining actual malice as follows:

A 'reckless disregard' for the truth, however, requires more than a departure from reasonably prudent conduct. 'There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.' *St. Amant [v. Thompson],* 390 U.S. [727,] 731 [88 S.Ct. 1323, 1325–26, 20 L.Ed.2d 262] * * * [ (1968) ]. [T]here must be sufficient evidence to permit the conclusion that the defendant actually had a 'high degree of awareness of … probable falsity.' *Garrison v. Louisiana,* 379 U.S. [64,] 74 [85 S.Ct. [209,] 215, 13 L.Ed.2d 125] [ (1964) ] ), As a result, failure to investigate before publishing, even when a

We reach this conclusion because of the interests attorney discipline serves.

This court certifies attorneys for practice to protect the public and the administration of justice. That certification implies that the individual admitted to practice law exhibits a sound capacity for judgment. Where an attorney criticizes the bench and bar, the issue is not simply whether the criticized individual has been harmed, but rather whether the criticism impugning the integrity of judge or legal officer adversely affects the administration of justice and adversely reflects on the accuser's capacity for sound judgment. An attorney who makes critical statements regarding judges and legal officers with reckless disregard as to their truth or falsity and who brings frivolous actions against members of the bench and bar exhibits a lack of judgment that conflicts with his or her position as "an officer of the legal system and a public citizen having special responsibility for the quality of justice." Minn.R.Prof. Conduct, Preamble.

We agree with the distinction made by the Supreme Court of Indiana when it stated:

> The societal interests protected by [defamation and professional disciplinary] law are not identical. Defamation is a wrong directed against an individual and the remedy is a personal redress of this wrong. On the other hand, the Code of Professional Responsibility encompasses a much broader spectrum of protection. Professional misconduct, although it may directly affect an individual, is not punished for the benefit of the affected person; the wrong is against society as a whole, the preservation of a fair, impartial judicial system, and the system of justice as it has evolved for generations.

*In re Terry,* 271 Ind. 499, 502, 394 N.E.2d 94, 95 (1979), *cert. denied sub nom Terry v. Indiana Supreme Ct. Disciplinary Comm'n,* 444 U.S. 1077, 100 S.Ct. 1025, 62 L.Ed.2d 759 (1980).

Because of the interest in protecting the public, the administration of justice and the profession, a purely subjective standard is inappropriate. The standard applied must reflect that level of competence, of sense of responsibility to the legal system, of understanding of legal rights and of legal procedures to be used only for legitimate purposes and not to harass or intimidate others, that is essential to the character of an attorney practicing in Minnesota. Thus, we hold that the standard must be an objective one dependent on what the reasonable attorney, considered in light of all his professional functions, would do in the same or similar circumstances.

## V. KNOWLEDGE OF FALSITY OR RECKLESS DISREGARD

■ The question before us, then, becomes whether Graham's statements were made with reckless disregard as to their truth or falsity. Both the findings and legal conclusions of the referee stated that Graham did in fact act with reckless disregard as to the truth or falsity of the statements made regarding Spellacy, McNulty, Rathke and Milligan. Pursuant to Rule 14(e), those findings and conclusions are considered conclusive for purposes of this review.

Graham argues, however, that because the referee noted in his Memorandum accompanying his findings of fact and conclusions of law that Graham's "feelings were genuine," he cannot find that Graham acted in knowledge of or in reckless disregard of the falsity of his statements, because the standard for determining reckless disregard is a subjective one. As we hold today that the standard is objective, the fact that Graham's feelings were "genuine" is insufficient to negate the referee's findings and conclusions that Graham acted with reckless disregard as to the truth

---

reasonably prudent person would have done so, is not sufficient to establish reckless disregard. * * * In a case * * * reporting a third party's allegations, 'recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports.' *St. Amant,* 390 U.S., at 732 [88 S.Ct., at 1326] * * *.

*Harte–Hanks,* —— U.S. at ——, 109 S.Ct. at 2696 (citations omitted; quotations included).

or falsity of his statements.[7]

Graham's charges were prompted by and dependent upon a third party's report of a snip of party conversation. The report gave, at the most, only the name of Milligan as having spoken to someone with clout who in turn contacted a Duluth judge. Graham, without any corroborative evidence, but based on his own suspicions, decided that the middleman had to be Spellacy. Although Graham attempted to lead Alderman in agreeing that the name must have been Spellacy, Alderman insisted he did not know. Also based on his own suspicions, Graham decided Rathke must have asked Milligan to instigate the conspiracy. No one had said Rathke's name had been mentioned. Thus, with only his own suspicions as guide, he accused Rathke and Spellacy of conspiracy along with McNulty and Milligan.

In the letter to Arnold, Graham stated that the conspiracy occurred "with the knowledge and consent, and at the request of Mr. Rathke." Letter to Arnold ("A. letter") at 1 (Feb. 16, 1988). In his judicial complaint to Judge Lay and in his affidavit, he made similar accusations of his "certain knowledge." Yet at the disciplinary hearing, he retracted his accusation and acknowledged that Rathke might only have acquiesced in the "fix."

As proof of Judge Spellacy's part in the conspiracy, Graham cited to a letter from Milligan to Spellacy, "acknowledging contact and communication between them relative to the pending case of *Shockman v. Rathke.*" A. letter at 2. A series of three letters between the parties shows no evidence of conspiracy. The letters relate to Milligan's desire to use Spellacy as a witness in the *Shockman v. Rathke* case to prove that Rathke had no control over the indictment process. As Spellacy had called the grand jury which indicted Shockman, his testimony was necessary and reasonable. Further, Spellacy's letter to Milligan refutes any impression of conspiracy. He states, "I cannot and will not talk to either attorney about what my testimony would be prior to actually testifying." Spellacy letter to Milligan ("S. letter to M.") at 1 (Dec. 14, 1987). Additionally, the initial letter from Milligan to Spellacy states that Milligan had tried to contact Spellacy by telephone on December 10, 1987, but had been unable to reach him. From testimony that the various parties to the alleged conspiracy were not in the same geographical location during the relevant time, it is evident that the conspiracy must have occurred via telephone. Yet Milligan's letter dispels that possibility. To read those letters and conclude that Spellacy was a middleman in a conspiracy shows a reckless disregard for the truth.

Another mainstay of Graham's "proof" of a conspiracy is what he terms the abrupt change in attitude of McNulty between the

---

**7.** Even under *Harte–Hanks,* it is doubtful that Graham's "genuine feelings" would have been enough. To determine whether the standard has been met, the Supreme Court noted that

> the reviewing court must consider the factual record in full. * * * [and] examine for [itself] the statements in issue and the circumstances under which they were made to see ... whether they are of a character which the principles of the First Amendment ... protect * * *.

*Harte–Hanks,* —— U.S. at ——, 109 S.Ct. at 2696 (citations omitted).

Although the Court in *Harte–Hanks* states that the standard is subjective, the manner in which the Court examined the entire record of evidence before it concluded that actual malice existed evidences a standard that requires more than a subjective statement that one's "feelings were genuine."

The case was brought by an unsuccessful candidate for public office who claimed that a newspaper article which quoted someone who accused him of using "dirty tricks" defamed him. *Id.* 109 S.Ct. at 2681–82. The charges were accurately reported as were the denials by the unsuccessful candidate, but the court noted that ample evidence in the record could support a finding that the principal charges were false. *Id.* 109 S.Ct. at 2692. After an independent review of the evidence, the Court found actual malice based in part on analysis of whom the newspaper chose to interview. Those decisions coupled with other evidence convinced the Court that the newspaper had serious doubts and acted with actual malice.

Thus, although the standard is expressed as "subjective," independent review of the evidence and inferring from that evidence that the newspaper acted with reckless disregard requires something more than a mere assertion of "genuine feelings" to avoid a finding of actual malice. Under *Harte–Hanks,* then, mere assertion of *genuine feelings* would *not* have been enough.

temporary injunction hearing on December 9, 1988 and the expedited trial on January 4–6, 1989. The referee found *nothing* in the *Shockman v. Rathke* trial transcript to support Graham's allegations regarding McNulty's extreme bias or abrupt change of attitude.

Graham made accusations as absolutes, yet attempted to soften them when questioned at the disciplinary hearing. No longer did the conspiracy occur of his "certain knowledge," but rather only on the basis of his belief. No longer was the conspiracy instigated by Rathke, but Rathke may have only acquiesced in it. No longer was the modus operandi political influence, but rather old boy peddling.

He put forth as evidence letters that could only be read as proving the opposite. He stated as fact that Spellacy was the middleman, when in fact the one source that said the case had been fixed, refused to name Spellacy as the person who could have been that person.

Impugning the integrity of judges and public legal officers by stating as certainties that which was based on nonexistent evidence or mere supposition is conduct that reflects a reckless disregard for the truth or falsity of the statements made, in violation of Rule 8.2(a).

## VI. FRIVOLOUS CLAIMS AND PREJUDICE TO THE ADMINISTRATION OF JUSTICE

Graham is also charged with violating disciplinary rules 3.1 and 8.4(d). These rules provide as follows:

3.1 Meritorious Claims and Contentions

A lawyer shall not bring * * * or assert * * * an issue [in a proceeding], unless there is a basis for doing so that is not frivolous, which includes a good faith argument for an extension, modification or reversal of existing law.

8.4 Misconduct

It is professional misconduct for a lawyer to:

* * * * * *

(d) engage in conduct that is prejudicial to the administration of justice * * *.

Under the review standard of Rule 14(e) and in light of the discussion above, we hold that Graham also violated these provisions. It is worthy of note that two other disciplinary proceedings have found the same allegations groundless and frivolous. Order, Judicial Council of the Eighth Circuit, JCP No. 88–001 (May 20, 1988); Determination that Discipline is not Warranted, Wernz, July 5, 1988.

## VII. THE SANCTION

The question of appropriate discipline remains. Other jurisdictions support imposition of discipline when attorneys have made reckless allegations of improper conduct. *See In re Belue*, 232 Mont. 365, 766 P.2d 206, 207–08 (1988) (attorney suspended for three months for, among other things, filing during a proceeding a frivolous motion for disciplinary action against opposing counsel accusing them of bribing the presiding judge); *Louisiana State Bar Ass'n v. Karst*, 428 So.2d 406, 409–10 (La. 1983) (attorney suspended for alleging judicial corruption when factual basis consisted only of his "logical inferences"; subjective belief in correctness of allegations does not excuse violation); *In re Terry*, 271 Ind. at 501–02, 394 N.E.2d at 95–96 (attorney disbarred for alleging without any basis that judge conspired to protect a criminal; court distinguished constitutional protection accorded in defamation actions from disciplinary proceeding and did not adopt same standard); *In re Frerichs*, 238 N.W.2d 764, 765, 770 (Iowa 1976) (attorney admonished for accusing Iowa supreme court of what amounted to fraud and deceit in its review of factual record).

The referee recommended that Graham be suspended from the practice of law for 60 days; that the reinstatement hearing required by the Rules on Lawyers Professional Responsibility ("R.L.P.R.") 18(a) through (d) be waived; that he successfully complete the professional responsibility portion of the state bar examination within one year of his suspension; and that he pay

$1000 in costs plus disbursements, pursuant to R.L.P.R. 24(a) and (b), respectively. In deciding what discipline to impose, we accord great weight to the referee's recommendation, but the decision as to what discipline to impose is ours. *In re Ylitalo,* 420 N.W.2d 615, 616 (Minn.1988).

Although the purpose of disciplinary proceedings is not to punish the attorney, sanctions are imposed to deter the improper conduct in the future. Where an attorney makes statements "of his certain knowledge," with reckless disregard as to the statements' truth or falsity, impugning the integrity of those who work within the judicial system, at the very least a public reprimand is in order.

In Graham's case, however, aggravating factors exist. Graham compounded the initial violations with which he is charged by writing to the Director expanding his allegations against Judge Spellacy to include perjury, deliberate falsehoods and criminal abuse of power. (Dir.Ex. 26A; 26B; 26D; 26H). Additionally, Graham lodged a frivolous motion to remove Wernz and his assistant from this case and a later frivolous petition to remove Wernz from office. By repeatedly entering frivolous motions to remove those who oppose him, Graham continues to violate Rule 3.1, Minn.R.Prof. Conduct.

Graham's attitude is similar to that of respondent attorney in *In re Williams.* This court noted there that Williams chose to believe in a conspiracy against him and preferred to find fault with others than himself. Williams was suspended for 6 months for engaging in trial tactics designed "to provoke and bait opposing counsel, intimidate and demean witnesses, and obfuscate the record." *In re Williams,* 414 N.W.2d at 397, 399.

In view of Graham's attitude, we believe a public reprimand insufficient and adopt instead the referee's recommendation of 60 days suspension and successful completion of the professional responsibility test.

IT IS, THEREFORE, ORDERED:

(1) Respondent John Remington Graham is suspended from the practice of law for 60 days, which period begins from the date of this opinion;

(2) Respondent must successfully complete the professional responsibility portion of the state bar examination within one year of the date of this opinion;

(3) Respondent shall pay $750 in costs;

(4) The reinstatement hearing required by the Rules on Lawyers Professional Responsibility ("R.L.P.R.") 18(a) through (d) shall be waived.