In re PETITION FOR DISCIPLINARY ACTION AGAINST Dale C. NATHAN, a Minnesota Attorney, Registration No. 77227.

No. C5–02–519.

Supreme Court of Minnesota.

Nov. 26, 2003.

Kenneth L. Jorgensen, Director, Timothy M. Burke, Senior Assistant Director, Office of Lawyers Professional Responsibility, St. Paul, MN, for Relator.

Dale C. Nathan, Eagan, MN, pro se.

## OPINION

### PER CURIAM.

This disciplinary action arises out of the misconduct of the respondent, Dale C. Nathan, in a child custody matter and a CHIPS proceeding. The Director of the Office of Lawyers Professional Responsibility (Director) filed a petition for disciplinary action on May 2, 2002. A hearing was held on October 2 and 3, 2002, before the Honorable Warren E. Litynski acting as referee. The referee found that Nathan: (1) violated Minn. R. Prof. Conduct 3.1, 3.4(c), 4.4, and 8.4(d) by engaging in a pattern of harassing and frivolous litigation; (2) violated Rules 3.4(c) and 8.4(d) by violating, threatening to violate, and assisting his client in violating court orders; (3) violated Rules 3.4(c) and 8.4(d) by violating and threatening to violate confidentiality statutes and rules; (4) made baseless and derogatory statements about judges in violation of Rules 8.2(a) and 8.4(d); (5) made false statements contrary to Rules 4.1 and 8.4(c); and (6) failed to pay or arrange to pay sanctions, violating Rules 3.4(c) and 8.4(d). The referee recommended that Nathan be indefinitely suspended from the practice of law, with leave to apply for reinstatement after six months.

Nathan was admitted to practice law in Minnesota in 1965. Nathan has been admonished twice before. Nathan's misconduct in these matters falls into three general categories. The first is a pattern of harassing and frivolous conduct; the second is a pattern of violating, threatening to violate and assisting others in violating court orders and confidentiality statutes; and the third is making unfounded derogatory statements about judges and false statements to others. We will consider Nathan's conduct in the child custody and CHIPS matters in turn.

### Child Custody Matter

In late 1999 or early 2000, Nathan began representing a mother in a child custody matter arising out of a paternity proceeding. The father was seeking unsupervised visitation of the child and the mother sought to prevent unsupervised visitation. The pattern of harassing and frivolous litigation that the referee found Nathan engaged in was pervasive in this matter.

Nathan sent the guardian ad litem several harassing letters. In one letter he called her "worse than worthless" and threatened to "deal with her accordingly." In another letter addressed to her, he threatened to inform others involved in the case that she was not "truthful or impar-

tial and cannot be trusted." Nathan also wrote letters to the judge complaining that the guardian ad litem was biased. Because of Nathan's conduct, an attorney was appointed to represent the guardian ad litem. Nathan then sent the guardian ad litem's attorney a letter threatening to publish the guardian ad litem's letters to him and the judge on Nathan's website "as examples of outrageous actions by a court-appointed quasi-expert."

Nathan engaged in a similar pattern of conduct towards the individual appointed as the visitation investigator. The judge ordered the parties to split the cost of hiring the investigator and to cooperate with her by giving her access to all necessary records and individuals. In a letter to the investigator, Nathan stated that he would not pay for her services, as he believed that the judge's order was "premature and unjustified." Nathan was also upset because he learned that during a supervised visitation session the investigator asked the child to refer to her father as "Dad." Nathan stated that this was "not acceptable" and threatened to discontinue visitation. Three days later, Nathan sent the investigator another letter, stating that she could not have direct contact with the mother or any member of her family. That letter included several derogatory statements about the investigator's professional reputation and threatened to publish a description of her actions on Nathan's website.

In addition to threatening to violate the court order to cooperate with and pay for the investigator, the referee found that Nathan violated and assisted his client in violating other court orders in this matter. After the judge adopted the investigator's visitation recommendation and ordered a transition from supervised to unsupervised visitation, the mother did not bring the child to a scheduled supervised visitation. The father's attorney moved for a contempt hearing and the mother went into hiding and did not appear. In an affidavit, the mother stated that she did not appear on Nathan's advice, and that throughout the time she was in hiding with the child, Nathan advised her not to turn herself in.[1] The father did not see the child again for over a year.

The judge asked Nathan multiple times to disclose his client's location and whether his client was in the state. Nathan stated that he advised his client not to appear but refused to give the legal basis for that advice. Nathan repeatedly refused to disclose any information relating to his client's location, citing attorney-client privilege. The judge found Nathan in contempt. Nathan still refused to disclose the location of his client and was incarcerated for 54 days. Nathan never complied with the court's order.

The referee also found that Nathan made a frivolous request for a stay in this matter when he requested that visitation be stayed until a claim of abuse was investigated. The same claim of abuse had been raised one year earlier and after an investigation was determined to be unfounded.

There are two statements that Nathan made about the judge in this case that the referee found to be baseless or derogatory. Both statements came in a petition that Nathan filed in the court of appeals to overturn the visitation order. In that petition, Nathan wrote that the judge "is a bad judge," who "substituted his personal view for the law" and "won election to the office

---

1. Subsequently, the mother was convicted of depriving another of custodial or parental rights under Minn.Stat. § 609.26 (2002).

of judge by appealing to racism." The referee found that the only evidence of a personal view the judge expressed was not inconsistent with the law. The referee also found that Nathan's sole basis for the allegation that the judge won election by appealing to racism was that the judge's opponent in the previous election had what Nathan referred to as a Hmong-sounding name.

In addition to the false statements Nathan made about the judge, the referee found that Nathan made a false statement to opposing counsel. During a telephone conversation, Nathan told opposing counsel that he had been recording the conversation without counsel's knowledge. Nathan did not in fact record the conversation.

*CHIPS Proceeding*

Nathan represented the mother of four children in a CHIPS proceeding in which Ramsey County sought to terminate the mother's parental rights to the two youngest children. The referee found that Nathan engaged in a pattern of harassing and frivolous litigation, violated and threatened to violate court orders and confidentiality statutes and rules, made baseless derogatory statements about judges, and made false statements.

The pervasive nature of the harassing and frivolous litigation and the threats to violate and violations of court orders and confidentiality statutes and rules in this matter are closely linked. Nathan sent a letter to the psychologist hired by the county demanding that she provide a written response to 31 questions. Nathan wrote: "If you do not provide satisfactory bases for your allegations, I will publish your letter on my website." Nathan also harassed the social worker in the case. In a memorandum to the court Nathan wrote: "What is happening in this case is madness. It is uncivilized. [The mother] is being denied custody of her children * * * by an out-of-control power crazed social worker on the basis of a report by a psychologist * * *. The person who is crazy is [the psychologist]." Nathan also repeatedly called the social worker a racist, including a statement in a memorandum to the court of appeals. Nathan continued with a similar course of conduct toward all involved in the case. For example, Nathan asked the court to order the foster parent of one of the children to send the child to the school of the mother's choice and threatened to sue the foster parent if the court did not grant his request.

As a result of Nathan's conduct and threats to disclose information, the judge issued a protective order restraining "Nathan from making public any part of the juvenile protection case record in this case without first obtaining a court order." The judge also ordered Nathan to pay $1,500 in sanctions and restrained him from further harassing any witnesses or parties. After the judge issued this order Nathan sent him a letter threatening to publish an article about the case "regardless of the consequences to me." Nathan then published an article on his website describing the case entitled *The Young Sex Perverts* and placed an ad in the newspaper directing individuals to the article. Nathan also sent letters to the assistant county attorney and others threatening to violate the protective order. In a memorandum responding to a contempt motion that followed, Nathan admitted that he published materials in violation of the court order because "[o]ccasionally, it is necessary to violate a court order or even a law in order to correct serious injustices."

The court found Nathan in contempt for violating the protective order and ordered him to remove all information regarding

the case from his website, fined him $500, and again restrained him from publishing any information regarding the case. Two days later Nathan sent the judge a letter stating that if the judge did not schedule a hearing and provide 10 items of relief he was requesting, he would publish an article in area newspapers. Enclosed was an article entitled *The Young Sex Perverts* with the judge's name prominently displayed below the title. Nathan published the article in the *St. Paul Pioneer Press* as a paid advertisement on November 3, 2000, shortly before election day.

The final piece of harassing and frivolous conduct in this matter is a federal lawsuit Nathan filed against the social worker, judge, assistant county attorney, psychologist, and one of the foster parents, among others, alleging their actions violated 42 U.S.C. § 1983 (2000). The defendants moved for summary judgment, and the federal district judge granted the motion and awarded the psychologist $2,607.09 in attorney fees.

In addition to the article Nathan published, he made other baseless and derogatory statements about judges in this matter. One of the other statements Nathan made was in a brief to the court of appeals. In that brief, Nathan called the judge "an extremely bad judge" and stated "I am aware that this Court is determined to support trial court judges in whatever action they take in order to preserve the almost unlimited power of judges to do what they wish."

The referee found that Nathan made false statements in two separate instances in this matter. First on October 3, 2000, Nathan requested permission from the judge to order a transcript of two witnesses' testimony. The request stated: "I will use the transcripts *only* for the purpose of preparing for cross-examination." (Emphasis added.) Then in a November 8 letter requesting the transcript for a different purpose, Nathan wrote: "As I thought I made clear, my purpose in obtaining this transcript *is not* to prepare for cross-examination." (Emphasis added.) After the judge pointed out these discrepancies Nathan sent another letter to the judge stating: "[O]ne of my purposes of ordering the * * * transcript was to prepare for cross-examination. Although not stated in that letter, a second purpose was to provide a copy of the * * * transcript to [the] psychologist."

The second false statement occurred when Nathan filed a motion seeking permission to provide information about the case to an organization performing research on juvenile crime. In that motion Nathan wrote that the research director requested information on the CHIPS case and that the "research director [of the organization] believes there may be major problems in the work of the Ramsey County Juvenile Court." The referee found that Nathan made this statement with knowing or reckless disregard for the truth because a research assistant from the organization contacted Nathan for general information only and did not ask for any material relating to a specific case.

Finally, the referee found that Nathan violated the rules of professional conduct by failing to pay or arrange to pay the $1,500 and $500 sanctions imposed in the CHIPS matter, and the $2,607.09 in attorney fees imposed in the federal lawsuit. At the time of the referee's decision in November of 2002, Nathan had not paid any of the sanctions owed Ramsey County. In his reply brief, Nathan claims that he has paid the sanctions; however, there is no evidence in the record that indicates payment.

*Disciplinary Action*

If a respondent orders a transcript of the referee's hearing, the referee's find-

ings of fact and conclusions of law are not conclusive and either party may challenge the findings of fact or conclusions of law. Rule 14(e), Rules on Lawyers Professional Responsibility (RLPR). Nevertheless, this court gives "great deference to a referee's findings on disputed facts and will not reverse the referee's findings and conclusions unless they are clearly erroneous." *In re Westby*, 639 N.W.2d 358, 367 (Minn.2002).

Nathan does not cite which of the referee's findings of fact and conclusions of law are clearly erroneous. However, there appear to be four primary issues that Nathan raises: (1) he did not file a frivolous motion in violation of Rule 3.1 by asking for a stay in the child custody matter; (2) he did not violate Rules 3.4(c) and 8.4(d) by failing to disclose the location of his client; (3) his statements about judges did not violate Rules 8.2(a) and 8.4(d); and (4) the alleged false statements were either justified or honest mistakes and therefore did not violate Rules 4.1 and 8.4(c). We will consider each argument in turn.

■ Nathan asserts that his request to stay unsupervised visitation in the child custody matter until the county could investigate the abuse allegation was not frivolous because the child verified the abuse to the psychologist, which constituted new evidence. The same claim of abuse had been raised one year earlier and after an investigation was determined to be unfounded. For this reason the referee's finding that the request for a stay was frivolous is not clearly erroneous.

■ Nathan contends that he did not violate the rules of professional conduct by refusing to disclose the location of his client. However, in an affidavit to this court on December 12, 2002, in support of his request to order a partial transcript, Nathan stated: "*I do not and will not challenge any of the findings in the Find-*

*ings of Fact, Conclusions of [L]aw, and Recommendations for Discipline dated November 22, 2002 in the subject proceedings that relate in any way to Conclusion[ ] of Law Number 2.*" (Emphasis added.) Conclusion of Law Number 2 concerns the referee's findings of fact that Nathan violated the order to disclose his client's location. Therefore, Nathan has waived any objections to the referee's conclusions on this issue.

■ "A lawyer shall not make a statement that the lawyer knows to be false or with reckless disregard as to its truth or falsity concerning the qualifications or integrity of a judge." Minn. R. Prof. Conduct 8.2(a). Nathan argues that in order to warrant discipline his statements had to constitute a clear and present danger to the administration of justice; his statements are protected because they are opinion, and that he believed there was a basis for the statements. However, statements about judges need not constitute a clear and present danger to the administration of justice to violate the rules of professional conduct. The cases Nathan cites to support his contention that we should apply a clear and present danger standard are inapposite. *See, e.g., Craig v. Harney*, 331 U.S. 367, 373, 67 S.Ct. 1249, 91 L.Ed. 1546 (1947) (discussing the prevention of publication of statements that could prejudice ongoing trials). Moreover, Nathan's statements about judges are not protected statements of opinion. Merely cloaking an assertion of fact as an opinion does not give that assertion constitutional protection. *In re Westfall*, 808 S.W.2d 829, 832–33 (Mo.1991) (citing *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18–19, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990), for the proposition that one cannot create an "artificial dichotomy" between opinion and fact by couching an assertion of fact as an opinion). The standard used to determine

if a statement is false or made with reckless disregard as to its truth or falsity is "an objective one dependent on what the reasonable attorney, considered in light of all his professional functions, would do in the same or similar circumstances." *In re Graham*, 453 N.W.2d 313, 322 (Minn.1990).

The referee's findings regarding Nathan's statements about judges are not clearly erroneous, as the statements plainly were made with knowing or reckless disregard for the truth. Additionally, Nathan's argument that he felt some of the statements are true is not germane because the standard for judging statements is an objective one. *See Graham*, 453 N.W.2d at 322.

■ Likewise, the referee's findings that Nathan made false statements are supported by the record and not clearly erroneous. Nathan admits that his statement to opposing counsel in the child custody proceeding that he was recording a telephone conversation was false, but contends that the statement was justified because opposing counsel became agitated during the conversation. Nathan does not cite any authority for the proposition that an attorney may lie to opposing counsel without violating the rules of professional conduct if that attorney believes the lie to be justified.

■ Nathan next contends that he requested court documents be released to the community organization based on what he believed was said in a voice mail message left by a research assistant. Nathan asserts that there may have been some confusion about the content of the message, but that he did not knowingly make a false statement. However, the record clearly demonstrates that the research assistant never requested documents relating to a specific case. Therefore, the evidence supports the referee's finding that the request for information was made with knowing or reckless disregard for the truth.

■ Nathan claims that his statements regarding the use of the transcript in the CHIPS proceeding were not false. Instead, Nathan argues that there was merely an inconsistency in two letters sent more than one month apart. The text of the *three* letters detailed above support the referee's findings. The discrepancies among these three letters are more than a mere inconsistency. In each letter, using unambiguous language, Nathan makes a different representation to the court regarding the use of the transcript.

■ The final issue we must consider is the appropriate discipline. "The purpose of discipline is not to punish the lawyer but, rather, 'to protect the courts, the public, and the profession and to guard the administration of justice.' " *Westby*, 639 N.W.2d at 370 (quoting *In re Flanery*, 431 N.W.2d 115, 118 (Minn.1988)). "In evaluating the appropriateness of the disciplinary sanction," this court considers "the misconduct, the cumulative weight of the disciplinary rule violations, the potential harm to the public, and the harm to the legal profession." *Id.* "Although prior cases may be helpful by analogy, each case must be decided on its unique facts and circumstances." *In re McCoy*, 447 N.W.2d 887, 890 (Minn.1989). A failure to acknowledge or express remorse for disciplinary violations is an aggravating factor. *See, e.g., In re Selmer*, 568 N.W.2d 702, 704 (Minn.1997); *In re Jensen*, 542 N.W.2d 627, 634 (Minn.1996); *In Re Pokorny*, 453 N.W.2d 345, 348 (Minn.1990).

Nathan's briefs and statements at oral argument demonstrate that he does not acknowledge his actions were wrong. Nathan made it clear both in his briefs and at oral argument that he does not believe that violating a court order one feels is

unjust is necessarily wrong. Additionally, Nathan apparently believes that violating a court order that has been appealed but not stayed is permissible. Nathan also implies in his brief that he will not engage in harassing conduct again solely because he now realizes that such conduct is ineffective. Furthermore, Nathan's threats to judges and parties if they refused to comply with his demands, and the fact that Nathan's client was convicted of a crime as a result of following his advice not to appear in court and produce the child, are particularly troubling examples of misconduct.

We have imposed indefinite suspensions in similar cases where attorneys engaged in a pattern of harassing and frivolous litigation. *Jensen,* 542 N.W.2d at 632–34 (indefinitely suspending attorney for a minimum of 18 months for engaging in a pattern of "harassing and frivolous litigation, neglecting professional obligations, and misrepresentations to judicial officers"); *Selmer,* 568 N.W.2d at 702–03 (indefinitely suspending attorney for a minimum of 12 months for engaging in a pattern of frivolous and harassing conduct). We concur with the referee's recommendation that Nathan should be indefinitely suspended from the practice of law with leave to apply for reinstatement after six months. However, considering the quantity and severity of Nathan's misconduct, we disagree with the referee's finding that Nathan should be given credit against the suspension for the 54 days he was incarcerated for contempt.

Accordingly, we order that:

1. Respondent Dale Nathan is hereby indefinitely suspended from the practice of law with no right to reapply for reinstatement for six months from the date of this opinion;

2. Nathan shall comply with Rule 26, RLPR;

3. Nathan shall successfully complete the professional responsibility portion of the bar examination within one year of the date of this opinion;

4. Nathan shall pay $900 in costs and disbursements pursuant to Rule 24, RLPR;

5. Nathan shall provide to the Director proof of satisfaction of all outstanding sanctions and attorney fees;

6. Any petition for reinstatement shall comply with the requirements of Rule 18(a)-(e), RLPR;

7. As a condition of reinstatement Nathan shall submit a sworn affidavit or testify under oath that he will not intentionally disobey a court order; and

8. If Nathan is reinstated to the practice of law, he shall be placed on supervised probation for two years following reinstatement, with the terms and conditions of probation to be determined at the time of reinstatement.

So ordered.

BLATZ, C.J., took no part in the consideration or decision of this case.