# In the Matter of Kevin P. Curry.

Suffolk. October 4, 2007. - February 6, 2008.

Present: Marshall, C.J., Greaney, Ireland, Spina, Cowin, & Botsford, JJ.

*Attorney at Law,* Disciplinary proceeding, Attorney-client relationship, Disbarment. *Board of Bar Overseers. Rules of Professional Conduct.*

This court did not address a challenge to one particular finding of a special hearing officer in a bar disciplinary proceeding, where the challenge did not rise to the level of proper appellate argument. [519-520]

In a bar disciplinary proceeding, the Board of Bar Overseers (board) did not err in concluding, based on its review of a report by a special hearing officer, that the respondent's conduct in setting up a sham job interview with the former law clerk of the judge in an ongoing litigation, in order to secure "admissions" about baseless allegations of improper conduct by the judge, violated the code of professional responsibility, where his conduct raised dishonesty, fraud, deceit, or misrepresentation and false statements of law or fact to heady levels, violating disciplinary rules that were not obscure and harbored no implicit exception; and where his treatment of the law clerk was not of a kind with instances in which lawyers employ undercover investigators to uncover discrimination in housing or employment or other violations of civil and criminal laws, but rather was an elaborate fraudulent scheme, the purpose of which was to elicit or potentially threaten the law clerk into making statements that he otherwise would not have made [520-525]; further, the respondent's conduct was self-evidently prejudicial to the administration of justice and showed disrespect to his profession, in that the purpose of the respondent's project was to discredit and thereby disqualify the judge in an ongoing matter, despite having no basis whatsoever for suspecting her of bias or misconduct, and in that he attempted to do so by piercing the confidential communications of a former law clerk and a judge in a pending matter to benefit one of the litigants [525-528]; moreover, in first reaching out to one of those litigants, and then in not only encouraging, but prodding, that litigant to authorize, fund, and continue multiple attempts to pressure the law clerk by means of dishonesty, fraud, deceit, and misrepresentation, the respondent counselled that client in conduct that the respondent knew to be illegal or fraudulent [528], and in engaging in most of this conduct in concert with his investigator, the respondent violated the prohibition against circumventing a disciplinary rule through the actions of another [528-529].

The special hearing officer in a bar disciplinary proceeding did not err in denying the respondent permission to call as an expert witness a former Massachusetts Attorney General, where that witness's testimony would not have been relevant; further, the special hearing officer did not err in excluding the testimony of a corespondent's legal ethics expert. [529-530]

This court concluded that disbarment was the appropriate sanction for an attorney who set up a sham job interview with the former law clerk of the judge in an ongoing litigation, in order to secure "admissions" about baseless allegations of improper conduct by the judge, where disbarment was not markedly disparate to sanctions imposed in other cases [530-531]; where the fact that the attorney was not involved in subsequent threats and misrepresentations made to the law clerk following a second sham interview was not a factor in mitigation [531-532]; and where the attorney's role as the instigator of the baseless plan to discredit a sitting judge constituted a significant aggravating factor, as did the attorney's marked lack of candor during the disciplinary proceedings [532].

INFORMATION filed in the Supreme Judicial Court for the county of Suffolk on December 5, 2006.

The case was reported by *Greaney*, J.

*Terry Philip Segal* for the respondent.

*Nancy E. Kaufman*, Assistant Bar Counsel.

MARSHALL, C.J. Attorney Kevin P. Curry contests an information filed in the county court by the Board of Bar Overseers (board) that unanimously recommends his disbarment for violating S.J.C. Rule 3:07, Canon 1, DR 1-102 (A) (2) and (4)-(6), as appearing in 382 Mass. 769 (1981), and S.J.C. Rule 3:07, Canon 7, DR 7-102 (A) (5) and (7), as appearing in 382 Mass. 785 (1981).[1] The disciplinary proceedings against him arose from Curry's role in a scheme to impugn the integrity of a

---

[1]In relevant part, S.J.C. Rule 3:07, Canon 1, DR 1-102, as appearing in 382 Mass. 769 (1981), provides:

"(A) A lawyer shall not:

". . .

"(2) Circumvent a Disciplinary Rule through actions of another.

". . .

"(4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.

"(5) Engage in conduct that is prejudicial to the administration of justice.

"(6) Engage in any other conduct that adversely reflects on his fitness to practice law."

In relevant part, S.J.C Rule 3:07, Canon 7, DR 7-102, as appearing in 382 Mass. 785 (1981), provides:

Superior Court judge in an ongoing matter by invading the confidential communications between the judge and her former law clerk in an attempt to affect the outcome of the case. The matter was tried before a special hearing officer appointed by the board. With one minor exception, which we address below, the board adopted in full the extensive findings and conclusions of the special hearing officer concerning Curry's conduct. It recommended disbarment.[2] The case is before us on reservation and report of the single justice. We accept the board's recommendation and remand the case to the county court where a judgment of disbarment shall enter.

As we describe more fully below, Curry engaged in egregious, multiple, and prolonged violations of the disciplinary rules prohibiting attorneys from acts of deceit and dishonesty in their professional dealings and from acting in a manner prejudicial to the administration of justice. With no motive other than his own financial gain, and with no evidence, Curry persuaded a group of dissatisfied litigants (with whom he had no prior dealings) in a bitterly-contested, high-stakes civil matter that a Superior Court judge had "fixed" their case, so that it was "over before it began." Curry then developed and participated in an elaborate subterfuge whose purpose was to induce or coerce the judge's former law clerk into making statements that the law clerk otherwise would not have made about the judge and her delibera-

---

"(A) In his representation of a client, a lawyer shall not:

". . .

"(5) Knowingly make a false statement of law or fact.

". . .

"(7) Counsel or assist his client in conduct that the lawyer knows to be illegal or fraudulent."

The Code of Professional Conduct, under which Curry has been found liable, has been superseded by the Massachusetts Rules of Professional Conduct. See S.J.C. Rule 3:07, as appearing in 426 Mass. 1303 (1998) (adopted June 9, 1997; effective Jan. 1, 1998), and as subsequently amended.

[2]Curry was one of three respondents in the bar disciplinary proceeding. Gary C. Crossen, a corespondent, also contests the information filed by the board in the county court recommending his disbarment for violating the same disciplinary rules under which Curry was charged. See *Matter of Crossen, post* 533 (2008) (*Crossen*). See also note 21, *infra*.

tive process, which Curry intended to use to remove the judge from the still ongoing case, and to require reversal of her prior rulings against the litigants Curry solicited.

Although unsuccessful, the ruse, which we describe below, caused needless embarrassment to a judge, an attorney, and their respective families; mocked the foundations of good-faith dealings and respect for the orderly administration of justice on which the legal profession stands; and damaged the public's perception of our legal system. Curry points to nothing that mitigates his actions or justifies a sanction short of disbarment.

We turn now to the background of this case, whose factual complexity requires a lengthy summary.

1. *Background.* We draw our recitation of facts from those found by the special hearing officer and adopted by the board, reserving recitation of certain facts for later discussion, as appropriate, and noting discrepancies where they occur. See *Matter of Hilson*, 448 Mass 603, 604 (2007). We focus on the facts most relevant to the information filed against Curry. For further details of the findings of the special hearing officer, see *Matter of Crossen, post* 533 (2008) (*Crossen*).

a. *Demoulas litigation.* This bar disciplinary proceeding has its origins in the protracted legal warfare between the family of George Demoulas and the family of Telemachus Demoulas over interests in the family supermarket business. See *Demoulas* v. *Demoulas*, 432 Mass. 43, 44 (2000) (recounting history of intrafamily litigation); *Demoulas* v. *Demoulas Super Mkts., Inc.*, 424 Mass. 501, 504-509 (1997) (recounting substance of dispute). See also *Demoulas* v. *Demoulas*, 428 Mass. 555 (1998). Here we summarize only the most salient facts, beginning in 1990. By that time, Demoulas Super Markets, Inc. (DSM), and other entities jointly owned by the families of brothers George and Telemachus Demoulas were estimated to be worth approximately $1 billion.[3] Two law suits filed in Superior Court in 1990 by

[3]So the special hearing officer found. Samuel Adams, one of the attorneys representing Arthur T. and the other children of Telemachus Demoulas, testified that as to the value of the assets in this litigation, "there were discussions in the neighborhood of a billion dollars."

George's family[4] against Telemachus and his family would eventually determine ownership and control of the bulk of the Demoulas fortune. The first lawsuit alleged that the Telemachus Demoulas defendants had fraudulently transferred stock from George's family to themselves, and that Telemachus's children had fraudulently received 400 shares of DSM stock belonging to George's family (stock transfer case). The second suit, brought by Arthur S. Demoulas, George's son, while the first case was pending, alleged that the Telemachus branch of the family had diverted corporate opportunities from DSM to entities the defendants separately controlled (shareholder derivative case). Superior Court Judge Maria Lopez presided over both cases.

The stock transfer case was tried before a jury. Judge Lopez directed verdicts for Telemachus's children on certain counts. Subsequently, in May, 1994, the jury returned verdicts in favor of George's family against Telemachus and his family for breach of duty related to the fraudulent transfer of stock and other interests belonging to the plaintiffs. Judge Lopez reserved the issue of damages.

The shareholder derivative case was tried before Judge Lopez without a jury from December 12, 1994, through May 15, 1995. Her decision was entered on August 3, 1995. Judge Lopez's law clerk for the trial was then in his second year of clerkship for the Superior Court; he worked on the case from the fall of 1994 until the end of August, 1995, when his clerkship ended.

Both the stock transfer case and the shareholder derivative case took fateful turns in three decisions issued by Judge Lopez in August, 1995. First, as just noted, on August 3, 1995, judgment entered in the shareholder derivative case. Judge Lopez found that the defendants had improperly diverted corporate opportunities of DSM, and ordered the rescission of certain transactions, disgorgement of improperly obtained gains, and payment of attorney's fees, all in favor of George's family. The next day, on August, 4, 1995, Judge Lopez, responding to a request by the plaintiffs, vacated the directed verdict for Telemachus's children that she had issued in the stock transfer case. Her new order directed that the disputed 400 shares of DSM stock be

[4]George Demoulas died in 1971. See *Demoulas* v. *Demoulas Super Mkts., Inc.*, 424 Mass. 501, 504 (1997).

held in constructive trust by Telemachus's children for members of George's family. Finally, on August 29, 1995, Judge Lopez amended the judgment in the shareholder derivative case to provide, among other things, for the repayment to DSM of certain cash distributions and sale proceeds, the cancellation of all promissory notes issued by DSM to shareholders, the transfer of all assets and liabilities of DSM and affiliated real estate entities to an entity held equally by George's and Telemachus's families, and payment of the plaintiffs' legal fees and expenses.[5] We upheld that judgment in major part and remanded the case to the Superior Court for additional findings and the issuance of orders implementing relief. See *Demoulas v. Demoulas*, 428 Mass. 555, 557-558, 591-592 (1998).

With our decision affirming Judge Lopez, it was settled that Telemachus's branch of the family would lose much of their control of the Demoulas businesses and fortune. Not surprisingly, the Telemachus Demoulas defendants were alarmed at this prospect. They were disappointed in the group of attorneys and law firms to whom they had paid millions of dollars in legal fees, and they were convinced that Judge Lopez was biased against them.[6] Their suspicions of Judge Lopez were heightened by some of these attorneys, who assured them that Judge Lopez was "too dumb" to have written the *Demoulas* decision.

We turn now to the events germane to this disciplinary proceeding. At the time of the conduct at issue in this matter, approximately August, 1995, through August, 1997, the Demoulas litigations were still ongoing. The dockets in the Superior Court reflect numerous motions and other proceedings, and there were ongoing proceedings in both the Appeals Court and this court for several years after the events that we shall describe. See, e.g., *Demoulas v. Demoulas Super Mkts., Inc.*, 428 Mass. 543 (1998).

    b. *The initial meeting with the Demoulas family.* In 1995,

---

[5]We shall refer to Judge Lopez's judgments in the shareholder derivative case in the trial court as the *Demoulas* decision.

[6]In *Demoulas v. Demoulas Super Mkts., Inc.*, 424 Mass. 501, 524-526 (1997), we dismissed as "wholly unpersuasive" the defendants' various arguments that a new trial was required because Judge Lopez had been biased against them. See *Demoulas v. Demoulas Super Mkts., Inc.*, 428 Mass. 543 (1998) (affirming denial of motion to recuse).

Curry was a member in good standing of the Massachusetts bar, having gained admission in 1968. Early in his career he spent five and one-half years as an assistant attorney general in the office of the Massachusetts Attorney General. Curry then entered private practice.

In August, 1995, approximately two weeks after Judge Lopez issued the *Demoulas* decision, Curry and Ernest Reid, a private investigator who had worked with Curry in the past, sent a letter to Telemachus proposing to meet with him concerning "a matter of importance and confidence."[7,8] As a result of this communication, Curry, Reid, and members of the Demoulas family, including Telemachus and his son, Arthur T. Demoulas (Arthur T.), met at DSM headquarters in Tewksbury in early September, 1995.[9] Curry told his hosts what they were apparently eager to hear: Judge Lopez had decided the shareholder derivative case against them before opening statements in the case. Specifically, he told them, among other things, that the case was "over before it began." He proceeded to make salacious and disparaging remarks about Judge Lopez's character on and off the bench, and also about the character of the plaintiffs' attorneys. Curry told Telemachus and the others that Judge Lopez had previously done "a big favor" for another individual

---

[7]Curry had no previous contact or relationship with any of the Demoulas family members. Curry testified before the special hearing officer that Reid instigated the idea of contacting Telemachus. The special hearing officer rejected Curry's version of events, in part because, "through the course of the hearing in this matter, I found Curry's testimony regarding his involvement in the events at issue to be almost completely unreliable and not believable. I believed little of what Curry said, unless it was corroborated by a witness whom I found to be credible or was merely background information." Although Curry maintains that "the evidence in this case does not warrant a finding that [Curry] devised a scheme to trick [the law clerk] into disclosing Judge Lopez's decision-making process," he does not dispute the special hearing officer's conclusions as to his credibility, which we determine in any case to be supported by the record.

[8]The letter mentioned George Macheras, a friend of Telemachus and a friend and client of Curry for whom Reid had worked on a previous matter. Curry and Macheras had had several conversations in which Macheras conveyed Telemachus's belief that he was "getting screwed" in court.

[9]Prior to the meeting, Reid had gathered public records concerning Judge Lopez, including records of her divorce from her first husband in 1987 and "papers" from the Governor's Council related to Judge Lopez's swearing-in ceremony.

in "a big case." Curry told them that their case was "fixed." However, at the time he made this presentation, Curry, in the words of the special hearing officer, "had no documentation to support any of his scurrilous charges."

Curry's aim was true. Telemachus was aghast that he had "been had." He asked Curry what could be done. Curry informed Telemachus and the others that they would need evidence of what Curry described as Judge Lopez's "prior corrupt acts" and "judicial misconduct" to take to this court and to the media. Curry volunteered himself and Reid to produce the evidence.[10] A week after the meeting, Arthur T. asked Curry and Reid to investigate Judge Lopez.[11] In the ensuing twelve months, Reid mined public records for information on the personal and professional lives of Judge Lopez and of the attorneys who had worked on the Demoulas cases for George's family. In November, 1996, Curry reviewed Judge Lopez's written decisions to that date in an effort to determine whether the judge had written the *Demoulas* decision.[12]

In November, 1996, Arthur T. gave Curry a resume that the law clerk, with Judge Lopez's permission, had sent to various Demoulas defense counsel in the fall of 1995 seeking employment. Reid and Curry deduced from the resume that the law clerk was interested in international commercial civil litigation. Together they decided to contact the law clerk under the guise of offering him lucrative employment in that field. In the words of the special hearing officer, they concocted the law clerk's "dream job."

c. *Initial meetings with the law clerk.* To further their plan, Reid gathered public documents relating to the law clerk, his neighbors, his parents, and their neighbors. In April 1997, Reid

[10]The special hearing officer determined that "Curry made it clear to the Demoulases that he was absolutely not going to work for or report to any other lawyers, and he and Reid would not work for them if they told their lawyers of Curry's and Reid's involvement."

[11]Curry asked for and received an initial payment of $25,000 for his services, and was eventually paid a total of about $130,000 to $140,000 by Arthur T.

[12]At Arthur T.'s suggestion, Curry also conducted an interview with a law professor whom some unnamed attorneys believed to have authored the *Demoulas* decision, on the pretext that he was looking for an expert witness on a case involving substantial assets. Curry came away from the interview undecided about the law professor's involvement in the *Demoulas* case.

contacted the law clerk by telephone. Using his real name, Reid told the law clerk that he was a headhunter who wished to interview him about an "attractive opportunity" as an attorney at a law firm, at a salary of $90,000 per year. The law clerk was excited,[13] and Reid set up a meeting in the law clerk's home on April 9, 1997, to discuss the "opportunity."

At their first meeting, Reid slightly changed course. He told the law clerk (falsely) that his client was a corporation with offices in Bermuda, New York, and Boston, and that the corporation was looking for in-house counsel. Using the pretext that his client demanded a candidate with excellent writing skills, Reid then asked him if he had worked on any "cases of note" while clerking for the Superior Court. The law clerk promptly replied, "[W]e wrote the *Demoulas* decision." When asked to clarify, he said, "I wrote the decision." He also told Reid that Judge Lopez had read, but not edited, the decision. A general discussion ensued about Judge Lopez, her husband, and her husband's businesses. Reid left with a promise to be back in touch.

The next day, Reid met Curry in Forest Hills Cemetery, where they often met for confidential talks. Among other things, Reid recounted the law clerk's remarks about authoring the *Demoulas* decision, and told Curry that the law clerk had sent him a copy of the decision. Curry then telephoned Arthur T. to report what he had learned from Reid.

On May 4, 1997, Reid called the law clerk to tell him that the "client" was impressed with the writing samples, especially the *Demoulas* decision. Reid arranged another interview for May 7, 1997. At the second meeting, Reid again emphasized the lucrative and adventurous aspects of the sham in-house position and probed more deeply into the authorship of the *Demoulas* decision. Among other things, the law clerk claimed that, although he discussed the case with Judge Lopez during the lengthy trial, the legal conclusions were his. When Reid asked if the case were rightly decided, the law clerk replied, "The

[13]The law clerk had had difficulty obtaining employment at the end of his first year of clerkship in the Superior Court, and again after his second year of clerkship ended in the fall of 1995. Eventually he did so, with the assistance of Judge Lopez, and in the spring of 1997, when he was first contacted, he was employed at a Boston law firm.

[Supreme Judicial Court] upheld me so what does it matter." Reid said the client would like to meet him either in New York or in Halifax, Nova Scotia, to which the law clerk agreed.

d. *The first sham interview (Halifax).* Reid subsequently reported to Curry that he did not have the "right vibes" from the law clerk at the second meeting and could not get what he "wanted" from him. The two decided on a third meeting with the law clerk, this time in Halifax, Nova Scotia. The special hearing officer did not credit Curry's testimony that Halifax was chosen because it was a place Reid had always wanted to visit. She concluded that Halifax was chosen because, unlike Massachusetts, Nova Scotia is a jurisdiction in which recording a conversation is legal so long as one party consents to the tape recording.

The preparations for the Halifax interview were substantial. The plan was for Curry to present himself to the law clerk as "Kevin Concave," an employee of a fictitious British Pacific Surplus Risks, Ltd. (British Pacific), an "international insurance underwriting business." Richard LaBonte, a private detective recommended by Reid, would also be present at the Halifax interview.[14] LaBonte was to pose as "Richard LaBlanc," another British Pacific employee. Reid and Curry arranged for business cards to be printed with the aliases of Curry and LaBonte. The business cards listed an address for British Pacific that was an actual address in London, a working facsimile number, and a telephone number that was answered by a person with an English accent when the law clerk called, as he later did. Curry and the two investigators also discussed whether the meeting with the law clerk should be tape recorded. The special hearing officer found that a decision not to tape record the interview was made during a telephone conference among the three in Halifax prior to the interview.[15]

Reid provided LaBonte with extensive documentation con-

---

[14]Witnesses offered differing explanations for why Reid did not accompany Curry to Halifax. None is material for our purposes.

[15]There was conflicting testimony from the law clerk, LaBonte, and others whether the Halifax interview had been tape recorded. The special hearing officer noted: "No tapes of the Halifax interview have ever been found. As a consequence, it will never be known for certain whether the interview was recorded, although I believe LaBonte's testimony that it was not."

cerning the law clerk. He scripted a set of interview questions. Some time before June 5, 1997, Curry gave Reid a round-trip airline ticket to Halifax and $300 in cash, both of which Reid passed on to the law clerk. The money was allegedly to compensate the law clerk for missing a day's work.[16]

On June 5, 1997, the law clerk flew to Halifax. At a meeting room in the Citadel Hotel, he met "Kevin Concave" (Curry), who was introduced as the director of operations at British Pacific, and "Richard LaBlanc" (LaBonte), "the person who put out fires" for the company. As the interview progressed from introductory generalities to specifics about the supposed job, the law clerk began to stutter. "Concave" told the law clerk that they knew he stuttered, and reassured him that they were interested primarily in his writing skills. When he asked how they knew he stuttered, Curry produced a recommendation letter mentioning his stutter that had been written by attorney Stephen Mulcahy in support of the law clerk's application for admission to the Massachusetts bar. The law clerk then volunteered that he did not personally know Mulcahy, but that Mulcahy had written the required recommendation letter as a favor to a mutual acquaintance, another attorney, who was unable to submit a letter.[17] The information about the bar recommendation letter was news to Curry and LaBonte.

The interview then proceeded with Curry spinning tales about the worldwide reach of British Pacific and the "adventures" the law clerk would have around the world in his work for the company. He told the law clerk that he would be paid in excess of $90,000 per year, in part to compensate him and his wife for lengthy stays they would be required to make in different countries. Then followed a series of questions by Curry and

---

[16]The special hearing officer noted: "[The law clerk's] reaction to receiving the $300 was, 'Great.' He had heard about big firm recruitment where the prospects are "taken to a concert or some place special," and he thought receiving the $300 was something similar. . . . His testimony demonstrates how naive he was about the recruiting process. Had [the law clerk] been more sophisticated, being handed $300 in cash for compensation for missing a day's work would have set off warning bells."

[17]The attorney, Edward Cotter, told the law clerk that he could not write the letter of recommendation due to a "conflict of interest" because he graded bar examinations. In fact, and unbeknownst to the law clerk, Cotter had been suspended from the practice of law. See note 19, *infra*.

LaBonte that was, in the words of the special hearing officer, "unquestionably designed to inquire into . . . Judge Lopez's deliberative process in the *Demoulas* decision, as well as to elicit potentially damaging personal information about her." Curry emphasized that writing skills were extremely important for the job. He told the law clerk, falsely, that attorney Robert Shaw was British Pacific's outside counsel, who had reviewed the *Demoulas* decision and was very impressed.[18] Curry then asked how the law clerk could have written the entire decision, as he claimed. According to the testimony of Curry and La-Bonte, the law clerk told them that Judge Lopez was biased and predisposed to find for the plaintiffs, and that she had told him before the trial started who "the good guys and the bad guys" were, and who the "winner and losers" were going to be. Curry and LaBonte also testified that the law clerk made negative comments about Judge Lopez's work habits and deliberately downplayed her contributions to the decision. The law clerk, in turn, testified that he had not made the statements attributed to him about Judge Lopez's predisposition in the *Demoulas* case. The special hearing officer, who credited most of the law clerk's testimony, did not credit his testimony on this issue. She concluded that he had indeed made statements to LaBonte and Curry about Judge Lopez's alleged predisposition against the Telemachus Demoulas defendants. She also concluded that Curry exaggerated and misrepresented the nature of the law clerk's statements about Judge Lopez, both to Arthur T. and in this bar discipline proceeding.

Curry and LaBonte concluded the sham interview by asking a series of questions about the law clerk's personal life, among them, his wife's ancestry and the extent of her college and law school debt; the occupations of his parents, brothers, and sisters; and whether he had ever done anything illegal or had any "skeletons in [his] closet." These questions, the special hearing officer found, were designed to elicit "compromising information" to use against the law clerk.

e. *The aftermath of the Halifax sham interview.* Back in

---

[18]Robert Shaw, an attorney practicing in New York, was a friend of Arthur T. Demoulas. Shaw later refused to agree to allow a second sham interrogation of the law clerk to be conducted in his New York law firm office. See *Crossen, supra* at 541 n.12.

Boston, Curry relayed to Arthur T., "I think we got him." On June 8, 1997, Arthur T., in turn, told Gary Crossen, one of the Telemachus Demoulas family defense counsel, about Curry and Reid and the Halifax sham. See *Crossen, supra* at 538-539. Crossen was unimpressed with the report that the law clerk claimed to have written the entire *Demoulas* decision. However, he believed that the information that Judge Lopez had prejudged the case to be both "troubling" and "significant." See *id.*

The same day he met with Crossen, Arthur T. also met with Curry to suggest that Crossen draft Curry's affidavit about the interview. Curry took offense at this suggestion and drafted his own affidavit. In his statement, Curry swore that the law clerk had declared four times during the course of the interview that Judge Lopez was "predisposed to find for the Plaintiffs," and that she had told him who the "bad guys and the good guys were" and who the "winners were going to be before the case began." Curry also averred that the law clerk claimed to have written the entire *Demoulas* decision, and that his bar application contained a letter of recommendation from an attorney who did not know him.[19] Curry signed, but did not date, the affidavit, which he gave to Crossen.

LaBonte also drafted an affidavit, with the help of his own counsel. LaBonte's affidavit indicates that the law clerk claimed "[o]n several occasions . . . that Judge Lopez was predisposed to find for the Plaintiff[s]" and that "before the start of the Trial . . . Judge Lopez told [the law clerk] that he will easily tell who was lying and that the Plaintiff[s'] physical evidence will be overwhelming." LaBonte signed and dated the affidavit and transmitted it by facsimile to Curry the next day.[20]

On June 9, 1997, Curry met in Crossen's office with Arthur

---

[19]The law clerk submitted an application for admission as an attorney to the Supreme Judicial Court in 1993. The application required submission of "two letters addressed to the Board of Bar Examiners stating facts relative to [the applicant's] character by persons who know [the applicant]." Applicants also were instructed to obtain the recommendation of "an attorney of the court of the Commonwealth of Massachusetts," who would "certify that the petitioner is of good moral character." This recommendation was required by S.J.C. Rule 3:01, § 1.2, as appearing in 382 Mass. 753 (1981).

[20]Neither affidavit alleged an extrajudicial source of the alleged bias against the Telemachus Demoulas defendants. See note 30, *infra*. See also *Crossen, supra* at 544 n.20.

T. and Richard K. Donahue, another member of the defense team.[21] The men discussed how best to make use of what Crossen considered the most important information from the Halifax sham interview, the information concerning Judge Lopez's alleged predisposition. Among other options, they considered filing the affidavits with the Commission on Judicial Conduct and verifying or further pursuing the Halifax information by continuing the ruse in New York or Bermuda, both one-party consent jurisdictions in which they might secretly tape record the law clerk's comments.

On or about June 11, 1997, Crossen determined that the best course of action would be to verify the Halifax information using his own investigators. See *Crossen, supra* at 539-540. He concluded that the best way to do this was to continue the job ruse and secretly tape record the law clerk's statements in New York. At a subsequent planning meeting for the New York "interview" attended by Crossen, three of his investigators, and Arthur T., Curry spoke about how the second interview should be conducted based on Curry's experiences with the law clerk.

The group ultimately decided that the law clerk would be told that the New York interview would be with a "decision maker" at British Pacific, a "Peter O'Hara." O'Hara's role was to be played by Peter Rush, a private investigator who previously had worked as a United States Secret Service special agent-in-charge in Boston. The planning group, which included Curry, also decided that LaBonte, whom the law clerk knew as "Richard LaBlanc" of British Pacific, should be present at the interview, and that Crossen and Stewart Henry, a private investigator, would go to New York to "monitor" the situation. We discuss the details of the New York interview in *Crossen, supra* at 542-545. Here it is sufficient to note that Curry was a

---

[21]Richard K. Donahue was hired by Telemachus and his wife, Irene, after Judge Lopez decided the shareholder derivative case in 1995, in order to supervise and coordinate ongoing litigation, monitor costs, and handle publicity. Donahue was the third attorney against whom the Office of Bar Counsel (bar counsel) brought disciplinary proceedings in connection with the law clerk matter. The special hearing officer recommended that Donahue be disbarred for his part in the scheme. The board, however, by a vote of seven to four, recommended that Donahue be suspended from the practice of law for three years. Donahue accepted the board's recommendation.

reluctant supporter of the New York plan, arguing instead that his and LaBonte's affidavits were sufficient to proceed with action to have Judge Lopez removed from the case.

On the day of the interview, June 17, 1997, Curry arrived unexpectedly at the New York hotel suite where the interview was to take place to reiterate his opposition to the plan. Crossen disagreed. Curry remained at the hotel suite for approximately fifteen minutes, during which time he made a call from his cellular telephone and was heard to say, "Everything looks okay to me. It's all set. . . . Anything else you want . . . . Okay. I'm out of here."[22] He was not present for the interview. Curry's fear of being displaced by the defendants' regular counsel had come to pass. For purposes of this bar disciplinary proceeding, his role in the law clerk matter was over.

2. *Bar disciplinary proceedings.* In January, 2002, the Office of Bar Counsel (bar counsel) filed a three-count petition for discipline against Curry, Crossen, and Donahue in connection with the law clerk matter. Among other things, the petition alleged that Curry "devis[ed] and participat[ed] in a scheme to induce a former law clerk under false pretenses into disclosing confidential communications with a judge regarding the decision-making process in a case," in violation of Canon 1, DR 1-102 (A) (2), (4)-(6), and Canon 7, DR 7-102 (A) (5) and (7)[23]; held out to the law clerk the false promise of lucrative employment, falsely represented his own identity and those of his associates, and lured the law clerk out of the Commonwealth on the false

---

[22]The special hearing officer did not believe Curry's testimony that he went to the hotel at the request of Arthur T. to object to the interview and the secret tape recording. Rather, she determined that Curry's sudden arrival in New York was precipitated by his fear of being replaced by Crossen, and his fear that, once it was discovered that Curry had exaggerated the law clerk's statements in Halifax, the lucrative remuneration from Arthur T. would end.

[23]Because the conduct at issue occurred from 1995 to 1997, bar counsel brought charges under the then applicable Canons of Ethics and Disciplinary Rules Regulating the Practice of Law, S.J.C. Rule 3:07, as appearing in 382 Mass. 768 (1981). As of January 1, 1998, Massachusetts adopted the Massachusetts Rules of Professional Conduct, S.J.C. Rule 3:07, as appearing in 426 Mass. 1303 (1998), amending in certain respects, and renumbering, to make the rules consistent, with certain exceptions, with the American Bar Association (ABA) Model Rules of Professional Conduct. See H.P. Wilkins, The New Massachusetts Rules of Professional Conduct: An Overview, 82 Mass. L. Rev. 261 (1997).

promise of a job interview for a lucrative position with a sham multinational corporation "for the purpose of inquiring into the deliberative process of a judge in a case tried before her," in violation of Canon 1, DR 1-102 (A) (2) and (4)-(6), and Canon 7, DR 7-102 (A) (5) and (7); inquired into the details of the personal life of the law clerk and Judge Lopez "in order to gain potentially damaging personal information for use in a pending legal matter," in violation of Canon 1, DR 1-102 (A) (5) and (6), and Canon 7, DR 7-102 (A) (1)[24] and (7); "plann[ed], execut[ed], and participat[ed] in a scheme to induce [a] former law clerk to travel to New York under the pretext of a job interview in order to tape a conversation with him without his knowledge or consent," in violation of Canon 1, DR 1-102 (A) (2) and (4)-(6) and Canon 7, DR 7-102 (A) (5) and (7); "plann[ed], execut[ed], and . . . participat[ed] in a scheme to induce a former law clerk to make damaging or compromising statements about himself or about the judge for whom he clerked with the false inducement of a lucrative employment . . . in order to force the judge's recusal or undermine her decisions in an ongoing case," in violation of Canon 1, DR 1-102 (A) (2) and (4)-(6), and Canon 7, DR 7-102 (A) (5) and (7).

Pursuant to S.J.C. Rule 4:01, § 3 (2), as amended, 430 Mass. 1314 (1999), and rule 3.19 (a) of the Rules of the Board of Bar Overseers (2007), the board designated a special hearing officer to take evidence and make findings of fact, conclusions, and recommendations. Over the next eighteen months, the special hearing officer heard twenty-four days of testimony involving twenty-one witnesses, accepted 177 documents in evidence, and made numerous evidentiary rulings. Her report issued on May 11, 2005, concluding that Curry's actions in connection with the law clerk matter violated all of the disciplinary rules under which he was charged, with one minor exception.[25] The board

---

[24]The special hearing officer rejected Bar Counsel's contention that this conduct violated Canon 7, DR 7-102 (A) (1). See note 25, *infra*. Bar counsel did not pursue this issue on appeal.

[25]The one exception was that the special hearing officer found that Curry's conduct in inquiring into the details of the personal life of the law clerk and Judge Lopez was not "merely to harass or maliciously injure another," S.J.C. Rule 3:07, Canon 7, DR 7-102 (A) (1), as appearing in 382 Mass. 785 (1981),

unanimously adopted the special hearing officer's recommenda-
tion that Curry be disbarred.

3. *Standard of review.* We review this appeal from the board's
recommendation for disbarment through a familiar lens. We
deem the special hearing officer "the sole judge of the cred-
ibility of the testimony presented at the hearing" on bar counsel's
petition for discipline. S.J.C. Rule 4:01, § 8 (4), as appearing in
426 Mass. 1309 (1997). See *Matter of Concemi*, 422 Mass. 326,
328 (1996). Her credibility determinations will be upheld unless
we are satisfied "with certainty" that a credibility finding was
"wholly inconsistent with another implicit finding" (citation
omitted). *Matter of Barrett*, 447 Mass. 453, 460 (2006). We ac-
cord great weight to the findings of fact, conclusions of law,
and recommendations of the board on its review of the special
hearing officer's report, upholding subsidiary facts found by the
board that are supported by substantial evidence when the re-
cord is viewed in its entirety. See *Matter of Driscoll*, 447 Mass.
678, 683 (2006). See also *Matter of Segal*, 430 Mass. 359, 364
(1999) ("While we review the entire record and consider what-
ever detracts from the weight of the board's conclusion, as long
as there is substantial evidence, we do not disturb the board's
finding, even if we would have come to a different conclusion
if considering the matter de novo"). Although we give great
weight to the recommendations of the board, they are not bind-
ing on this court. *Matter of Hilson*, 448 Mass. 603, 611 (2007).
*Matter of Fordham*, 423 Mass. 481, 487 (1996), cert. denied,
519 U.S. 1149 (1997). We may reach our own conclusions.
*Matter of Anderson*, 416 Mass. 521, 525 (1993). Ultimately, we
must decide every case on its own merits, such that every of-
fending attorney receives the disposition most appropriate in the
circumstances. *Matter of the Discipline of an Attorney*, 392
Mass. 827, 837 (1984).

4. *Challenged findings of fact.* Curry accepts all of the special
hearing officer's findings of fact but one. In a footnote to his
brief, he argues that there was clear error in her finding that he
went to New York to try to stop the interview with the law

because it had an objective: disqualifying Judge Lopez. This issue aside, the
special hearing officer found that each of the above noted elements of Curry's
conduct violated each of the rules listed.

clerk because he feared that the law clerk's remarks in the New York interview would not support his accounts of Halifax, which would lead to an end to his lucrative engagement by Arthur T. See note 22, *supra*. Curry argues that the special hearing officer's finding that his testimony was not credible on this point does not alone support her more damning interpretation of his motives. Even if Curry's conclusory footnote rose to the level of proper appellate argument, which it does not, see *Zora* v. *State Ethics Comm'n*, 415 Mass. 640, 642 n.3 (1993) (noting that "bald assertions of error, lacking legal argument and authority," do not "rise[] to the level of appellate argument"), we would not disturb that challenged finding. The special hearing officer's conclusion was well-buttressed by substantial evidence of Curry's mercenary motivations and many fabrications. Moreover, the distinction Curry urges makes little difference to the question of his culpability for creating and perpetuating the sham job scheme that was the basis of both the Halifax and New York incidents.

We now turn to Curry's challenges to the board's legal conclusions.

5. *Violations of the code of professional responsibility.* Curry claims that, contrary to the board's conclusions, his conduct in setting up the first interview in Halifax to "secure admissions" about "improper conduct" by Judge Lopez in the stockholder derivative case was "proper and ethical." The disciplinary rules, he says, do not prohibit "pretextual" interviews as a means of getting at the truth. Alternatively, Curry argues that, even if his conduct violated the rules, he acted reasonably and in good faith in an area where the rules were unclear. He further contends that the testimony of his expert, which the special hearing officer excluded, would have supported his defense of good faith. Finally, Curry asserts that, "where highly responsible attorneys differ about whether [Curry's] conduct was unethical, it is grossly unfair and unjust to disbar [him] in the case which announces a new rule." We reject each of these arguments for the reasons explained below.

The purpose of the disciplinary rules and accompanying proceedings is to protect the public and maintain its confidence in the integrity of the bar and the fairness and impartiality of our

legal system. See *Matter of Alter*, 389 Mass. 153, 156 (1983); *Matter of Gordon*, 385 Mass. 48, 55 (1982); *Matter of Keenan*, 314 Mass. 544, 547 (1943). Without the public's trust that lawyers and judges act in good faith and strictly within the bounds of our laws and professional norms, the rule of law has little practical force. The record amply demonstrates that Curry violated the most basic ethical precepts of his profession and, in so doing, has harmed both the legal profession and the public's perception of our justice system.

a. *Dishonesty and false statements.* The admonitions of the disciplinary rules against "conduct involving dishonesty, fraud, deceit, or misrepresentation," DR 1-102 (A) (4), and "[k]nowingly mak[ing] a false statement of law or fact," DR 7-102 (A) (5), both of which are central to this case, are not aspirational. They are not obscure. They harbor no implicit exception. Nor are they limited to statements made in court or to interactions between the lawyer and the client. Disciplinary Rule 1-102 (A) (4) applies, for example, to lawyers' dealings with third parties. See, e.g., *Matter of Hurley*, 418 Mass. 649, 656-657 (1994) (conviction for conspiracy to defraud Internal Revenue Service); *Matter of Hayeck*, 13 Mass. Att'y Discipline Rep. 252 (1997) (impersonation of police officer); *Matter of Glaser*, 13 Mass Att'y Discipline Rep. 231 (1997) (conviction for conspiracy to commit larceny).[26] Similarly, violations of DR 7-102 (A) (5) may involve making false oral or written representations of fact or law to third parties outside of court. See, e.g., *Matter of Tierney*, 13 Mass. Atty. Discipline Rep. 768, 769-770 (1997) (preparation and delivery to clients of purported court decree that attorney had fabricated); *Matter of Kennedy*, 13 Mass. Att'y Discipline Rep. 349, 350 (1997) (submission of falsified tax returns to lender).[27]

Curry's conduct in this matter raised "dishonesty, fraud,

---

[26]Violations of Mass. R. Prof. C. 8.4 (c), 426 Mass. 1429 (1998), the successor to DR 1-102 (A) (4), include the knowing omission of facts in a written request for a Medicare lien waiver, see Matter of Daniels, Board of Bar Overseers No. BD-2006-111 (Jan. 8, 2007); the knowing making of false statements of fact to a tribunal and the backdating of documents, see Matter of MacDonald, Board of Bar Overseers No. BD-2007-004 (March 29, 2007); and the misrepresentation of material facts to a client's health insurer and the sending of conflicting reports to two different insurers, see *Matter of Goodman*, 22 Mass. Att'y Discipline Rep. 352, 358 (2006).

[27]Rule 4.1 (a) of the Massachusetts Rules of Professional Conduct, 426

deceit, or misrepresentation" and "false statement[s] of law or fact" to heady levels. His misconduct began with baseless insinuations to the Telemachus Demoulas family that he knew Judge Lopez was predisposed against them and that he could gather other evidence of the judge's misconduct. His chicanery then blossomed into the creation of an entirely false universe, complete with sham executives and a sham multinational enterprise with a verifiable London telephone number. In this fabricated world, designed to ensnare a judge in a pending case through the words of her former law clerk, Curry compounded his deceit by appearing as Kevin Concave, spinning lies about a nonexistent job opportunity to the law clerk in the hopes of mining "admissions" from the young man. Curry misinformed Arthur T. that in the Halifax interview he "got" the law clerk, and he subsequently misrepresented the nature of the law clerk's statements in Halifax about Judge Lopez's personal and professional character. He participated in planning meetings to further the deception of the law clerk by means of another sham "job interview" in New York, which would be tape recorded without the law clerk's knowledge or permission for purposes of coercing the law clerk's sworn testimony against Judge Lopez in a motion to recuse in ongoing litigation. Curry's actions were not on the boundaries of ethical conduct, "about which reasonable [attorneys] differ," and the appraisal of which is "not . . . immediately apparent to any scrupulous citizen who confronts the question." *Matter of Ruffalo*, 390 U.S. 544, 556 (1968) (White, J., concurring). No "new rule" is needed to place the respondent's action clearly within the ambit of behavior that DR 1-102 (A) (4) and DR 7-102 (A) (5) were intended to proscribe.

Curry argues, however, that his treatment of the law clerk was of a piece with instances in which lawyers employ undercover investigators to uncover discrimination in housing or employment or other violations of civil and criminal laws. It was not. The United States Supreme Court approved the use of

Mass. 1401 (1998), the successor to DR 7-102 (A) (5), has also been applied to a variety of false statements made outside of court to third parties. See, e.g., *Matter of Dash*, 22 Mass. Att'y Discipline Rep. 179, 180 (2006) (making false statements to insurance adjuster regarding case); *Matter of Goodman*, *supra* (making false representations to client's health insurer).

testers to ferret out discrimination in housing in *Havens Realty Corp.* v. *Coleman*, 455 U.S. 363, 373-375 (1982). "Testing" involves deception of a particular kind: investigators pose as members of the public interested in procuring housing or employment, in order to determine whether they are being treated differently based on their race or sex. Their aim is to reproduce an existing pattern of illegal conduct. Some private investigators whose aim is to uncover other civil wrongdoing, such as trademark infringement or breach of contract, similarly disguise their identity and purpose without running afoul of ethical rules. For example, in *Gidatex, S.r.L.* v. *Campaniello Imports, Ltd.*, 82 F. Supp. 2d. 119, 120-121 (S.D.N.Y. 1999), an attorney for the plaintiff furniture manufacturer used undercover investigators to visit the showroom of the defendant, a retailer and former licensee, to note that the defendant was wrongfully continuing to use the plaintiff's trademarks and was falsely claiming to customers that the plaintiff was out of business. The investigators posed as customers. The court held that the investigation violated no ethical rule. "The presence of investigators posing as interior decorators did not cause the sales clerks to make any statements they otherwise would not have made. There is no evidence to indicate that the sales clerks were tricked or duped by the investigators' simple questions . . . ." *Id.* at 122.[28]

Curry's scheme is different from such investigations not only in degree but in kind — as both the special hearing officer and

---

[28]In a similar case, *Apple Corps Ltd.* v. *International Collectors Soc'y*, 15 F. Supp. 2d. 456, 475-476 (D.N.J. 1998), a Federal District Court in New Jersey found the use of private investigators posing as ordinary customers did not violate N.J. R. Prof. C. 8.4(c) (which contains prohibition on conduct involving "dishonesty, fraud, deceit, or misrepresentation" identical to DR 1-102 [A] [4]). In that case, the plaintiffs were suing to enforce a consent decree in which the defendant had agreed to cease selling merchandise such as postage stamps bearing the name or likeness of John Lennon or the Beatles. *Id.* at 458. In order to investigate the defendant's alleged violations of this consent decree, counsel for one of the party plaintiffs instructed her secretary, and subsequently hired several private investigators, to telephone the defendant and order its products. *Id.* at 462-464. Some of the investigators actually did purchase, and received, the stamps, along with free booklets about Lennon that the defendant had printed (allegedly in violation of the consent decree). Other investigators telephoned and received information about the products that the defendant was selling, but did not actually buy the items. *Id.*

the board rightly concluded.[29] Unlike discrimination testers or investigators who pose as members of the public in order to reproduce pre-existing patterns of conduct, Curry built an elaborate fraudulent scheme whose purpose was to elicit or potentially threaten the law clerk into making statements that he otherwise would not have made. In particular, by leading the law clerk to believe that his "dream job" depended on the outcome of his interview, flying him to Nova Scotia, and paying him hundreds of dollars in cash, Curry created an artificial situation designed to cause the law clerk to make statements about Judge Lopez and the *Demoulas* decision that he would not have made absent such inducements. Curry further structured the ruse so as to elicit a particular set of answers to those questions: by emphasizing that the law clerk's future was riding on his writing skills, Curry pressured him to give an account of the process of writing the *Demoulas* decision in which the law clerk claimed Judge Lopez played little or no role. Finally, Curry engaged in an elaborate fishing expedition into the law clerk's background aimed at discovering any "skeletons" or perceived vulnerabilities that Curry could use later to exert further coercive pressure on the law clerk. This coercive and deceptive process was designed to trick the law clerk, not to note or reproduce his usual behavior.

Curry also makes an analogy between his conduct and that of government prosecutors. This analogy is even less apt than the analogy to testers and other private investigators. As we discuss in *Crossen*, *supra* at 566-568, prosecutors are subject to a variety of powerful procedural and constitutional constraints on misleading and deceptive conduct to which private attorneys are not subject. See generally F.C. Zacharias & B.A. Green, The Uniqueness of Federal Prosecutors, 88 Geo. L.J. 207, 228-229 (Jan.

---

[29]Curry's conduct also differed from any conduct contemplated by a law review article, coauthored by a former chair of the American Bar Association's standing committee on professional responsibility, which Curry cites. See D.B. Isbell & L.N. Salvi, Ethical Responsibility of Lawyers for Deception by Undercover Investigators and Discrimination Testers: An Analysis of the Provisions Prohibiting Misrepresentation Under the Model Rules of Professional Conduct, 8 Geo. J. Legal Ethics 791 (1995). For the reasons discussed in *Crossen*, *supra* at 565-566, that article provides no support for the proposition that Curry's conduct was ethical.

2000). For the reasons we discuss in *Crossen, supra*, to suggest that government attorneys might engage in some forms of subterfuge and deception does nothing to excuse Curry's conduct, which unambiguously violates the ethical rules.

b. *Harm to the administration of justice.* Curry's conduct was self-evidently "prejudicial to the administration of justice," in violation of DR 1-102 (A) (5), for at least two reasons. First, the purpose of Curry's project, and the basis on which he sought to insinuate himself into the Demoulas legal team, was to discredit and thereby disqualify Judge Lopez in an ongoing matter, even though he had no credible evidence of any kind to suspect Judge Lopez of a scintilla of bias against the defendants, or of any other judicial misconduct.[30] He presented himself to the losing Demoulas side armed only with the belief — which turned out to be correct — that he could persuade them to pay him substantial legal fees by stoking their doubts about whether they had been fairly treated by the court. Put another way, Curry, who as an attorney is "an officer of the court," *Matter of Cobb*, 445 Mass. 452, 468 (2005), quoting *Gentile* v. *State Bar of Nev.*, 501 U.S. 1030, 1072 (1991), was willing to sacrifice the reputation of the court for his own personal financial gain. Because the administration of justice depends on a baseline of confidence in the integrity of the judicial system, Curry's self-generated, duplicitous project was "prejudicial to the administration of justice." See *Matter of Cobb, supra* ("Statements by an attorney critical of a judge in a pending case in which the attorney is engaged are especially disfavored," particularly when those statements are "unfounded"). See also *Bradley* v. *Fisher*,

---

[30]Curry had no reason to believe that Judge Lopez acquired information or opinions about the Telemachus Demoulas defendants or any other witnesses from an "extrajudicial source" that would constitute bias. See *Liteky* v. *United States*, 510 U.S. 540, 551 (1994) ("[N]ot subject to deprecatory characterization as 'bias' or 'prejudice' are opinions held by judges as a result of what they learned in earlier proceedings. It has long been regarded as normal and proper for a judge to sit in the same case upon its remand, and to sit in successive trials involving the same defendant"); *Haddad* v. *Gonzales*, 410 Mass. 855, 863 (1991) (judge's opinion of litigant acquired from previous experience in judicial role rather than from "extrajudicial source" not ground for recusal). Any impressions Judge Lopez might have had of the litigants based on her experiences as the judge in an earlier phase of the litigation do not constitute a source of bias. *Demoulas* v. *Demoulas Super Mkts., Inc.*, 424 Mass. 501, 524-525 (1997).

80 U.S. (13 Wall.) 335, 355 (1871) (attorneys must "maintain at all times the respect due to courts of justice and judicial officers. This obligation is not discharged by merely noting the rules of courteous demeanor in open court, but it includes abstaining out of court from all insulting language and offensive conduct toward the judges personally for their judicial acts"). At the time of Curry's conduct in this matter, Judge Lopez continued to preside over ongoing litigation in the *Demoulas* family disputes. "A system that permits an attorney without objective basis to challenge the integrity, and thereby the authority, of a judge presiding over a case elevates brazen and irresponsible conduct above competence and diligence, hallmarks of professional conduct." *Matter of Cobb, supra* at 472.

Second, Curry's efforts to pierce the confidential communications of a former law clerk and a judge in a pending matter to benefit one of the litigants also constitute "conduct prejudicial to the administration of justice." Curry insists that his contact with the law clerk was proper because "[t]here is no privilege in Massachusetts protecting communications between a judge and her law clerk."[31] Here Curry targets the wrong mark. Curry is correct that we have not explicitly recognized a privilege regarding communications between a judge and her law clerk, a matter we need not address here, for Curry's logic is flawed. That such a privilege has not been explicitly recognized does not mean that an attorney (or anyone else, for that matter) is free to induce or coerce a law clerk into revealing confidential communications between the clerk and the judge about an ongoing matter to benefit one of the litigants, in particular confidential communications that the law clerk otherwise would not have revealed. The administration of justice requires respect for the internal deliberations and processes that form the basis of judicial decisions, at very least while the matter is still pending.

Curry was not, as he suggests, a noble crusader seeking to root out judicial misconduct by engaging the law clerk in an interview that was a pretext. He had no factual basis for attacking

---

[31]The special hearing officer presumed that a privilege regarding communications between a judge and her law clerk does not exist in Massachusetts, but also stated that her recommendation for discipline would not be different if such a privilege were recognized.

Judge Lopez's integrity. Curry's ultimate goal was to obtain sworn statements from the law clerk, or his cooperation, in the effort to have Judge Lopez recused from the *Demoulas* litigation, and then have her prior decisions in the litigation overturned. This course of action showed a breathtaking lack of respect for the administration of justice in the Commonwealth, violating DR 1-102 (A) (5). See *Matter of Cobb*, *supra* at 471, quoting *In re Graham*, 453 N.W.2d 313 (Minn.), cert. denied sub nom. *Graham* v. *Wernz*, 498 U.S. 820 (1990) ("[C]riticism impugning the integrity of judge or legal officer" merits discipline if it "adversely affects the administration of justice and adversely reflects on the accuser's capacity for sound judgment. An attorney who makes critical statements regarding judges and legal officers with reckless disregard as to their truth or falsity . . . exhibits a lack of judgment that conflicts with his or her position as an officer of the legal system and a public citizen having special responsibility for the quality of justice" [quotations and citations omitted]).

The disrespect Curry displayed to the court is, as well, disrespect to his chosen profession. Disciplinary Rule 1-102 (A) (6) provides that a lawyer shall not "[e]ngage in any other conduct that adversely reflects on his fitness to practice law." This rule has been applied to a variety of categories of misconduct, any of which reflects adversely on the attorney's fitness to practice. See, e.g., *Matter of Barach*, 22 Mass. Att'y Discipline Rep. 36, 43-44 (2006) (charging for work not performed, falsifying time records, and intentionally misrepresenting facts to bar counsel); *Matter of Birchall*, 22 Mass. Att'y Discipline Rep. 89, 91 (2006) (converting client funds); *Matter of Traficonte*, 22 Mass. Att'y Discipline Rep. 747, 765 (2006) (settling case without clients' knowledge or consent); *Matter of Cavicchi*, 3 Mass. Att'y Discipline Rep. 37, 41 (1982) (mailing, during representation of criminal defendant, copy of criminal record of prosecution witness to that witness's employer).[32] Here, because Curry's misconduct was of a kind that calls into question his candor, motives, and respect for the legal

---

[32]More recently we have found violations for a variety of conduct under Mass. R. Prof. C. 8.4 (h), 426 Mass. 1429 (1998), the successor to DR 1-102 (A) (6). See *Matter of Ascher*, 22 Mass. Att'y Discipline Rep. 14, 21 (2006) (intentional use of client funds to pay own business and personal expenses); *Matter of Carey*, 22 Mass. Att'y Discipline Rep. 131, 132 (2006) (intentional

system, we readily conclude that he "behaved in such a way that [he] is no longer worthy of the trust the courts and public must place in [his] representations, [his] conduct, and [his] character." *Matter of Lebbos*, 423 Mass. 753, 755 (1996). There was no error in finding Curry unfit to practice law. DR 1-102 (A) (6).

c. *Client misconduct.* Disciplinary Rule 7-102 (A) (7) provides that, in representing a client, a lawyer shall not "[c]ounsel or assist his client in conduct that the lawyer knows to be illegal or fraudulent." See, e.g., *Matter of Birchall, supra* at 89 (assisting client to transfer all of her assets in order to protect them from creditors); *Matter of Epstein*, 12 Mass. Att'y Discipline Rep. 138, 141 (1996) (signing, at real estate closings, false affidavits on behalf of client). As we discussed above, Curry was the one who first reached out to Arthur T., and then not only encouraged, but prodded, his client to authorize, fund, and. continue multiple attempts to pressure the law clerk by means of "dishonesty, fraud, deceit, [and] misrepresentation," DR 1-102 (A) (4). Curry thereby violated DR 7-102 (A) (7).

d. *Use of agents.* Disciplinary Rule 1-102 (A) (2) provides that an attorney shall not "[c]ircumvent a Disciplinary Rule through actions of another."[33] In other words, an attorney may not delegate to another that which he himself is prohibited from doing. See *Miano* v. *A.C. & R. Advertising, Inc.*, 148 F.R.D. 68, 82, adopted by 834 F. Supp. 632 (S.D.N.Y. 1993). An investigator is "another" for purposes of this rule. See *In re Allen*, 52 Cal. 2d 762, 764-766 (1959). Curry engaged in most of the conduct at issue in these proceedings in concert with his investigator Ernest Reid.[34] When Reid and other investigators working with Curry engaged in conduct that would have violated discipli-

misrepresentation to mortgage lender and title insurer that properties were free and clear of liens).

[33]Rule 8.4 (a) of the Massachusetts Rules of Professional Conduct, successor to DR 1-102 (A) (2), provides that a lawyer shall not "violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another." Cases involving violations of rule 8.4 (a) further demonstrate the extent to which an attorney may be held accountable for the actions of others. See, e.g., *Matter of Mason*, 22 Mass. Att'y Discipline Rep. 550, 557 (2006) (attorney wrongfully acquired property by causing or permitting woman improperly to sign estranged husband's name on deed).

[34]Conduct in connection with the New York sham interview involved addi-

nary rules had Curry done it himself, Curry thereby violated DR 1-102 (A) (2) as well. A lawyer's obligations of good faith to the tribunal and to others would mean little if the lawyer could use surrogates to achieve by deceit and falsehood that which he himself could not do. See *Crossen, supra* at 561; *Miano* v. *A.C. & R. Advertising, Inc., supra.*

In his answer and testimony, Curry attempted to distance himself from Reid's conduct by suggesting that he (Curry) was not in charge of the investigation; that Curry was the agent of Reid, rather than the other way around; and that Reid conducted certain initial parts of the sham job scheme without Curry's knowledge. However, the special hearing officer found, and the record amply supports, that contrary to Curry's testimony, the two men worked together on the ruse from the start. They "together decided" to contact the law clerk and use the sham job scheme to elicit information. Reid, who was not an attorney, was not bound by the requirements of legal ethics. But Curry was so bound, whether he understood himself to be working as an attorney or as an "investigator." Because Curry worked with Reid and others to engage in conduct that violated other ethical rules, Curry violated DR 1-102 (A) (2).

6. *Expert witness.* Curry argues briefly that in order fully to present his defense that he acted in good faith, he should have been permitted to call as an expert a former Massachusetts Attorney General to testify to the effect, in Curry's words, that Curry "acted in good faith at all times." Curry also suggests in passing that he was prejudiced in his defense by the special hearing officer's refusal to allow an expert in legal ethics called by Crossen to testify. We disagree. Curry's lack of good faith is evident from the well-supported conclusions of the special hearing officer, which Curry does not expressly challenge. No expert testimony erases the fact that he acted against Judge Lopez with no factual basis to do so, and for his own personal gain.

There also was no error in the decision of the special hearing officer not to permit the former Attorney General to testify. Her decision was based on grounds of relevance. The fact finder in a bar discipline proceeding generally needs no expert assistance

tional investigators who also were not attorneys.

to understand and to apply the ethical rules; thus, "[e]xpert testimony concerning the fact of an ethical violation is not appropriate." *Fishman* v. *Brooks*, 396 Mass. 643, 650 (1986). See *Matter of Tobin*, 417 Mass. 81, 86 (1994). Here, according to the board, Curry proffered the former Attorney General to testify "about the norms for undercover investigations in the context of criminal law enforcement." The conduct of Curry, a private person, cannot be compared with criminal investigations of State and Federal prosecutors. See *Crossen, supra* at 566-568. The testimony would not have been relevant. Thus, the proposed expert testimony was rightly excluded. In addition, for the reasons we set forth in *Crossen, supra* at 570-572, the special hearing officer did not err in excluding the testimony of Crossen's legal ethics expert.

7. *Sanctions.* We review a recommended disciplinary sanction to determine whether it "is markedly disparate from judgments in comparable cases." *Matter of Finn*, 433 Mass. 418, 422-423 (2001). See *Matter of Foley*, 439 Mass. 324 (2003). "We generally afford substantial deference to the board's recommended disciplinary sanction." *Matter of Griffith*, 440 Mass. 500, 507 (2003). "[T]he primary factor for our consideration 'is the effect upon, and perception of, the public and the bar.' " *Matter of McInerney*, 389 Mass. 528, 535 (1983), quoting *Matter of Alter*, 389 Mass. 153, 156 (1983). The appropriate level of discipline is that which is necessary to deter other attorneys and to protect the public. *Matter of Concemi*, 422 Mass. 326, 329 (1996). Fundamentally, "[e]ach case must be decided on its own merits and every offending attorney must receive the disposition most appropriate in the circumstances." *Matter of the Discipline of an Attorney*, 392 Mass. 827, 837 (1984). With these principles in mind, we turn now to the question whether disbarment is a markedly disparate sanction to impose in this case.

Curry argues that, even if he violated the disciplinary rules, disbarment is a disproportionately severe sanction when compared with past dispositions of matters involving similar factual allegations. In particular he draws our attention to *Matter of Foley, supra*, in which an attorney was suspended for three years for coaching his client, a criminal defendant, to present a

fabricated story to a tribunal, conduct that clearly was illegal. *Id.* at 335. For reasons we discuss in *Crossen, supra* at 575-576, the circumstances in the *Matter of Foley* decision and the circumstances in this case are substantially different in a way that does not benefit Curry. Although Foley's actions were despicable, they did not involve baseless attempts to strike at the heart of the judicial system by impugning the integrity of a sitting judge in an ongoing matter. Nor did they involve such an elaborate and sustained misrepresentation as Curry's efforts to dupe the law clerk. We also cannot ignore the humiliation and embarrassment to which the conduct initiated by Curry subjected Judge Lopez, the law clerk, and their families, with no basis in fact. A sanction is disproportionate only when it deviates mark-edly from the sanction that would be or has been imposed for misconduct comparable to Curry's misconduct, taken as a whole. See *Matter of Finn, supra* at 424 ("We take into account the cumulative effect of all violations when determining the ap-propriate level of discipline"). Taken as a whole, Curry's conduct was sufficiently sustained and egregious to merit disbarment.

a. *Mitigation.* Factors in aggravation and mitigation are im-portant in determining whether a sanction of disbarment is ap-propriate. See *Matter of McBride*, 449 Mass. 154, 164 (2007); *Matter of Finn, supra* at 424-425.

Curry urges this court to consider in mitigation the fact that, unlike Crossen, see *Crossen, supra* at 561-563, Curry was not involved in "the threats and misrepresentations by which Cros-sen and Donahue later sought to compel [the law clerk's] cooperation." It is true that Curry was not involved in the threats and misrepresentations Crossen and Donahue made to the law clerk following the second sham interview in New York, where the law clerk did not make the desired statements disparaging of Judge Lopez.[35] It is also true that Curry faces no disciplinary sanction for that conduct. But this is not properly a factor in mitigation. To note that Curry did not engage in some of the

[35]Curry did, however, lay the groundwork for pressuring the law clerk through use of the stick as well as the carrot: Curry and Reid carefully gathered whatever embarrassing personal information they could glean from the law clerk's own statements and from public records in order to have the option of pressuring him.

violations that Crossen and Donahue perpetrated merely delineates the violations for which Curry was responsible from those for which he was not. The seriousness of Crossen's and Donahue's conduct does nothing to mitigate Curry's responsibility as the initial and prime mover of the fraudulent scheme, solely to insinuate himself into the legal team to reap fees from the client.

b. *Aggravation.* Curry's role as the instigator of the baseless plan to discredit Judge Lopez constitutes a significant aggravating factor. Unlike the existing lawyers representing the Telemachus Demoulas family, Curry had no reason to insinuate himself into the *Demoulas* litigation, and he did so only by positing salacious allegations against Judge Lopez for which he had no support. None of the misconduct in this case, by Curry or by the other attorneys who later became involved, would ever have happened had Curry's pecuniary motivations not overwhelmed any respect he might have felt for a sitting judge, her law clerk, their internal deliberations, their families, their character, and his own basic ethical obligations, all in the course of ongoing litigation.

A separate aggravating factor was the "marked lack of candor" Curry showed during the disciplinary proceedings. See *Matter of Eisenhauer*, 426 Mass. 448, 457 (1998); *Matter of Friedman*, 7 Mass. Att'y Discipline Rep. 100, 103 (1991). That lack of candor is summed up by the special hearing officer's assessment finding "Curry's testimony regarding his involvement in the events at issue to be almost completely unreliable and not believable." False representations to bar counsel are "comparable to making false representations to a court," *Matter of Sprei*, 10 Mass. Att'y Discipline Rep. 246, 249 (1994). Curry's lack of candor and his misrepresentations under oath to bar counsel constitute a serious factor in aggravation.

In light of Curry's clear violations of the disciplinary rules under which he was charged, the presence of significant aggravating factors, and the absence of mitigating factors, we conclude that disbarment is an appropriate sanction in this case.

8. *Conclusion.* For the reasons stated above, we adopt the recommendation of the board and remand to the county court where a judgment of disbarment shall enter.

*So ordered.*